# United States Court of Appeals
## For the First Circuit

No. 16-2023

RACHEL CULLINANE, JACQUELINE NÚÑEZ, ELIZABETH SCHAUL,
and ROSS MCDONAGH, on behalf of themselves and
all others similarly situated,

Plaintiffs, Appellants,

v.

UBER TECHNOLOGIES, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

Matthew W.H. Wessler, with whom Matthew Spurlock, Gupta Wessler PLLC, John Roddy, Elizabeth Ryan, and Bailey & Glasser LLP were on brief, for appellants.

S. Elaine McChesney, with whom Lawrence T. Stanley, Jr., Emma D. Hall, and Morgan, Lewis & Bockius LLP were on brief, for appellee.

Jennifer D. Bennett, Public Justice, P.C., Jonathan D. Selbin, Jason L. Lichtman, Andrew R. Kaufman, Lieff Cabraser Heimann & Bernstein, LLP, Jahan Sagafi, Paul W. Mollica, Outten & Golden LLP, Stuart Rossman, and National Consumer Law Center, on brief for amicus curiae Public Justice P.C., and National Consumer Law Center in support of appellants.

Ben Robbins, Martin J. Newhouse, and New England Legal

Foundation, on brief for amicus curiae New England Legal Foundation in support of appellee.

Andrew J. Pincus, Archis A. Parasharami, Daniel E. Jones, Karianne M. Jones, Mayer Brown LLP, Kate Comerford Todd. Warren Postman, and U.S. Chamber Litigation Center, on brief for amicus curiae the Chamber of Commerce of the United States of America in support of appellee.

———————————

June 25, 2018

———————————

**TORRUELLA**, **Circuit Judge**. This case concerns the enforceability of an arbitration clause contained in an online contract. Plaintiffs-Appellants Rachel Cullinane, Jacqueline Núñez, Elizabeth Schaul, and Ross McDonagh, (collectively, "Plaintiffs"), filed this putative class action in Massachusetts Superior Court on behalf of themselves and other users of a ride-sharing service in the Boston area against Defendant-Appellee Uber Technologies, Inc. ("Uber"). In their complaint, Plaintiffs alleged that Uber violated a Massachusetts consumer-protection statute by knowingly imposing certain fictitious or inflated fees. Uber removed the case to the United States District Court for the District of Massachusetts, and filed a motion to compel arbitration and stay or dismiss the case. The district court granted Uber's motion to compel arbitration and dismissed the complaint. For the reasons explained below, we reverse and remand.

## I. Background

Because Uber's motion to compel arbitration was made in connection with a motion to dismiss or stay, we draw the relevant facts from the operative complaint and the documents submitted to the district court in support of the motion to compel arbitration. Gove v. Career Sys. Dev. Corp., 689 F.3d 1, 2 (1st Cir. 2012).

## A. Factual Background

Uber provides a ride-sharing service that transports customers throughout some cities, including Boston, for a fee. Uber licenses the Uber mobile application (the "Uber App") to the public so that users may request transportation services from independent third party providers in the users' local area. To be able to request and pay for third party transportation services, Uber App users must first register with Uber by creating an account. At the time Plaintiffs created their accounts, prospective users could either register through the Uber App or register directly through Uber's website.

All four named Plaintiffs downloaded the Uber App on iPhones and used the Uber App to create Uber accounts between December 31, 2012 and January 10, 2014. On September 13, 2013, Plaintiff Jacqueline Núñez ("Núñez") used the Uber App to order transportation to Boston Logan International Airport ("Logan Airport") and was charged, in addition to the cost of the transportation, $8.75 for a Massport Surcharge & Toll[1] (the "Massport Surcharge"). Plaintiff Rachel Cullinane ("Cullinane") used the Uber App to request transportation from Logan Airport on

---

[1] According to the Plaintiffs, at the time Uber explained in its Boston website that the Massport Surcharge "cover[ed] Massport fees and other costs related to airport trips."

-4-

June 29, 2014, and was charged $5.25 for the East Boston toll[2] and the same $8.75 Massport Surcharge. Plaintiff Elizabeth Schaul ("Schaul") used the Uber App to obtain transportation both to and from Logan Airport on multiple occasions. Each time, Uber charged her the $8.75 Massport Surcharge. The last named Plaintiff, Ross McDonagh ("McDonagh") claims he used the Uber App for several trips -- not all of them to or from Logan Airport -- and was charged $5.25 for the East Boston toll and the $8.75 surcharge, even when he did not travel to or from Logan Airport. The Plaintiffs object to the Massport Surcharge and the East Boston tool because they maintain that Uber charged these fees unnecessarily (i.e. there was no requirement from the Commonwealth of Massachusetts that these fees be charged to Uber passengers). Now, the Plaintiffs seek to represent a class of Massachusetts-resident Uber passengers who have been charged the Massport Surcharge and East Boston toll, and have not received a refund for these charges.

**B. Uber App Registration Process**

All prospective Uber passengers must go through Uber's registration process. When Plaintiffs used the Uber App to register, the process included three different screens that asked for user information. The first screen, titled "Create an

---

[2] Also according to the Plaintiffs, Uber charged an East Boston toll to passengers traveling through East Boston.

Account," asked users to enter an e-mail address, a mobile phone number, and a password for the account. Immediately above the phone's keyboard -- which occupied half of the phone screen -- written in dark gray against a black background, was the text: "We use your email and mobile number to send you ride confirmations and receipts."

The second screen, entitled "Create a Profile," prompted the user to enter their first and last name, and to upload a picture. This screen also included dark gray text on a black background which read: "Your name and photo helps [sic] your driver identify you at pickup."

The third screen varied slightly during the thirteen-month period during which the Plaintiffs registered. The first two plaintiffs to register, Núñez and Schaul, saw a third screen titled "Link Card." The last two plaintiffs to register, Cullinane and McDonagh, saw a third screen titled "Link Payment." Irrespective of its title, the third and final screen prompted the user to enter the appropriate payment information for Uber's services. Because the design and content of both versions of the third screen are particularly relevant to this case, we discuss them in greater detail.

### 1. "Link Card"

When confronted with the third screen, Núñez and Schaul were presented with the "Link Card" screen. This is what it looked like:[3]



As depicted in the screenshot above, the screen contained a thick gray bar at the top of the screen with the title "Link Card." To the left of the title was a "CANCEL" button and to the right was an inoperative and barely visible "DONE" button.

---

[3] The parties do not dispute that the screenshots attached to Uber's motion to compel arbitration accurately depict the content of the Uber App screens presented to the Plaintiffs. The screenshots, however, are larger than the actual size of the average smartphone's display. Because the Plaintiffs contend that the iPhones they used to register with Uber had 3.5-inch displays, we reproduce the screenshots found in the record as they would appear in a smartphone's display that is approximately 3.5 inches, measured diagonally. Uber does not concede that the Plaintiffs' iPhone displays were this size.

Below the thick gray title bar was a blank text field where users could enter their credit card information.  The blank text field was white, contrasting with the black background, horizontally traversing the screen, and included some light gray numbers to exemplify the type of information required.  In addition, at the beginning of the blank text field, and to the left of the light gray numbers, there was an icon representing a credit card.  The "Link Card" screen automatically included a number pad, covering half of the screen, for users to type their credit card information into the blank text field.

The screen also included text, just below the blank text field, that instructed users to "scan your card" and "enter promo code."  This text was written in light gray bolded font.  The "scan your card" text had a bright blue camera icon to its left, and the "enter promo code" had a bright blue bullet-shaped icon enclosed in a circle.  The record is unclear as to whether the "scan your card" and "enter promo code" texts were clickable buttons.[4]

Finally, the "Link Card" screen also included dark gray text which read: "By creating an Uber account, you agree to the."

---

[4]  A clickable button is "[a]n icon on screen that is 'pressed' by clicking it with the mouse or, if a touchscreen, tapping it with a finger."  PC Mag., https://www.pcmag.com/encyclopedia/term/39092/button (last visited June 15, 2018).

Below this text was the phrase "Terms of Service & Privacy Policy" in bold white text enclosed in a gray rectangle. According to Uber, this rectangular box indicated that this phrase was a "clickable button."

### 2. "Link Payment"

Plaintiffs Cullinane and McDonagh confronted a third screen that looked like this:



The "Link Payment" screen was very similar to the "Link Card" screen, except that it provided for an additional payment option that altered the screen's initial presentation. Instead of a blank text field for credit card information and the aforementioned number pad, the "Link Payment" screen displayed the blank text field and a large blue button with the PayPal logo.[5]

---

[5] PayPal is "an internet service to pay for transactions online."

The blue PayPal button was located immediately below a centralized dark gray text reading "OR," indicating the existence of two payment options. Below the PayPal button, at the bottom of the screen, the texts "[b]y creating an Uber account you agree to the" and "Terms of Service & Privacy Policy" were presented in the same manner as previously described.

If the user selected the blank text field to input his or her credit card information, the user would then "engage[] the keyboard" and the "Link Payment" screen would resemble the "Link Card" screen.

Notwithstanding the differences in the third screen, the design and general mechanics of the Uber App interface remained fairly uniform. For example, all screens included a gray bar at the top. Within this bar the user was presented with the screen title written in capital letters in a dark colored font. Below the title, but within the gray bar, was an illustration of three circles connected by a green line. These circles indicated the user's progress through Uber's registration process.

In addition, on all screens, the gray bar incorporated two buttons: one to the left and one to the right of the screen's title. The left button was a "CANCEL" button, written in all

United States v. Frechette, 583 F.3d 374, 377 n.1 (6th Cir. 2009).

capital letters. This button was enabled throughout the registration process, even before the user interacted with the screen. On the first two screens the right button was a "NEXT" button, also written in all capital letters. The "NEXT" button would remain barely visible and inoperative until after the user had entered the required information for each screen. In both versions of the third screen, the "NEXT" button was replaced by a "DONE" button. This "DONE" button also remained inoperative and barely visible until the user had entered the requested payment information.

## C. Uber's Terms and Conditions

Uber's Terms and Conditions (the "Agreement")[6] consisted of an approximately ten-page document[7] that was available to Uber App users during the registration process via hyperlink. If the user "clicked" on the "Terms of Service & Privacy Policy" button[8]

---

[6] During the time relevant to this case there were two versions of the Agreement. One version was in effect between September 21, 2012 and May 16, 2013 and the other was in effect from May 17, 2013, onward. The only difference between these two documents was the size of the headings for each section.

[7] Plaintiffs allege that "[m]ost Uber users would have accessed this document on a mobile phone" converting the document to over thirty-five pages of text on a 4.7-inch iPhone screen. However, the parties dispute the actual size of Plaintiffs' iPhone displays.

[8] In this sense, Uber's "Terms of Service & Privacy Policy" button was a hyperlink. "[When accessed on a computer a] hyperlink is a 'string of text or a computer graphic that a user can 'click' with the mouse pointer' to open a new browser page." iLOR, LLC v.

-11-

in either version of the third screen, he or she would be taken to another screen that contained two additional clickable buttons entitled "Terms & Conditions" and "Privacy Policy."  The Agreement was displayed on the user's screen once the "Terms & Conditions" button was clicked.  However, the Uber App did not require prospective users to "click" any of these buttons or access the Agreement before they could complete the registration process.

The Agreement contained a "Dispute Resolution" section that provided that the user and Uber:

> [A]gree that any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof or the use of the Service or Application (collectively, **"Disputes"**) will be settled by binding arbitration . . . . **You acknowledge and agree that you and [Uber] are each waiving the right to a trial by jury or to participate as a plaintiff or class User in any purported class action or representative proceeding.**

(Emphasis in original).  Furthermore, the Agreement stipulated that "[t]he arbitration [would] be administered by the American Arbitration Association ('AAA') in accordance with the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (the 'AAA Rules')" and that the Federal

---

Google, Inc., 631 F.3d 1372, 1374 (Fed. Cir. 2011) (citation omitted).  And hyperlinks found on phone applications (like the Uber App) can generally be accessed with the mere touch of the finger.  See PC Mag., supra n.4.

-12-

Arbitration Act ("FAA") would govern the interpretation and enforcement of the Agreement's arbitration.

## D. Procedural Background

In November 2014, plaintiffs filed this putative class action against Uber in Massachusetts Superior Court. The complaint was originally filed by plaintiffs Cullinane and Núñez and alleged five causes of action. By the end of December 2014, Uber filed a Notice of Removal to the United States District Court for the District of Massachusetts pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d). Plaintiffs first moved to remand to state court,[9] but then filed an amended complaint adding Schaul and McDonagh as plaintiffs and including a new cause of action for unfair and deceptive practice pursuant to Massachusetts General Laws chapter 93A. On May 4, 2015, Uber moved to compel arbitration and stay proceedings or, in the alternative, to dismiss the case, relying on the arbitration clause of the Agreement. Plaintiffs then filed a second amended complaint on August 4, 2015, dropping all but two causes of action, the chapter 93A violation and a claim for common law unjust enrichment.

---

[9] This motion was denied on June 22, 2015.

After a hearing, the district court granted Uber's motion to compel arbitration and dismissed the case. This timely appeal followed.

## II. Standard of Review

We review "de novo an order compelling arbitration where the appeal involves solely legal issues as to the enforceability of an arbitration clause." Pelletier v. Yellow Transp., Inc., 549 F.3d 578, 580 (1st Cir. 2008). We, of course, "focus only on the threshold issue of arbitrability [and] do not rule on the merits of the underlying claims." Unite Here Local 217 v. Sage Hosp. Res., 642 F.3d 255, 259 (1st Cir. 2011). Because the facts at issue in this case are undisputed, the question of whether the parties contractually bound themselves to arbitration is a question of law for the court also subject to de novo review. See TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 (1st Cir. 2007) (citation omitted) (quoting Lambert v. Kysar, 983 F.2d 1110, 1114 n.4 (1st Cir. 1993)). Had that not been the case, we would have had to review factual determinations for clear error. Id.

## III. Discussion

Under the FAA, "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2 (2012). The Supreme Court has stated

-14-

that the FAA reflects "a federal liberal policy favoring arbitration agreements." AT&T Mobility LLC v. Concepción, 563 U.S. 333, 346 (2011) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)). It was Congress's intention to "place arbitration agreements 'upon the same footing as other contracts.'" Scherk v. Alberto-Culver Co., 417 U.S. 506, 511 (1974) (quoting H.R. Rep. No. 68-96, at 2 (1924)). Nevertheless, the "FAA does not require parties to arbitrate when they have not agreed to do so." Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989). Therefore, in deciding a motion to compel arbitration, a court must first determine "whether '. . . there exists a written agreement to arbitrate.'" Combined Energies v. CCI, Inc., 514 F.3d 168, 171 (1st Cir. 2008) (quoting Bangor Hydro-Elec. Co. v. New Eng. Tel. & Tel. Co., 62 F. Supp. 2d 152, 155 (D. Me. 1999)). The burden of making that showing lies on the party seeking to compel arbitration. See Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 375 (1st Cir. 2011) ("A party seeking to compel arbitration under the FAA must demonstrate 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope.'"

(quoting <u>InterGen N.V.</u> v. <u>Grina</u>, 344 F.3d 134, 142 (1st Cir. 2003))).

It is well settled that "arbitration is a matter of contract." <u>Rent-a-Center, West, Inc.</u> v. <u>Jackson</u>, 561 U.S. 63, 67 (2010). "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." <u>First Options of Chi., Inc.</u> v. <u>Kaplan</u>, 514 U.S. 938, 944 (1995). The district court applied Massachusetts law and the parties do not challenge that decision. <u>Cullinane</u> v. <u>Uber Techs., Inc.</u>, 2016 WL 3751652, at *5. In any event, we agree with the district court that Massachusetts contract law applies.

The Massachusetts Supreme Judicial Court ("SJC") has not addressed the issue of contract formation for online agreements.[10]

---

[10] Judge Weinstein of the District Court for the Eastern District of New York has described the four general types of online contracts. These are: (1) Browsewrap; (2) Clickwrap; (3) Scrollwrap; and (4) Sign-in-wrap agreements. <u>Berkson</u> v. <u>Gogo LLC</u>, 97 F. Supp. 3d 359, 394-402 (E.D.N.Y. 2015). Briefly summarized:

> Browsewrap exists where the online host dictates that assent is given merely by using the site. Clickwrap refers to the assent process by which a user must click "I agree," but not necessarily view the contract to which she is assenting. Scrollwrap requires users to physically scroll through an internet agreement and click on a separate "I agree" button in order to assent to the terms and conditions of the host website. Sign-in-wrap couples assent to the terms of a website with signing up for use of the site's services . . . .

However, in Ajemian v. Yahoo!, Inc., 987 N.E.2d 604, 611-15 (Mass. App. Ct. 2013), the Massachusetts Appeals Court ("Appeals Court") addressed the enforceability of forum selection and limitation clauses within an online contract and that court's decision is "trustworthy data for ascertaining state law." Losacco v. F.D. Rich Constr. Co., 992 F.2d 382, 384 (1st Cir.), cert. denied, 510 U.S. 923 (1993); see also Candelario Del Moral v. UBS Fin. Servs. Inc. of P.R., 699 F.3d 93, 103 n.7 (1st Cir. 2012) (citing Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-78 (1940)). While the clauses at issue in Ajemian did not include an arbitration clause, "the essential question presented was the same: what level of notice and assent is required in order for a court to enforce an online adhesion contract?" Cullinane, 2016 WL 3751652, at *6. Consequently, we apply the principles stated in Ajemian.

In Ajemian, the Appeals Court determined that there was "no reason to apply different legal principles [of contract enforcement] simply because a forum selection clause . . . is contained in an online contract." 987 N.E.2d at 612. Therefore,

_____

Id. at 394–95 (emphasis omitted). Yet, our analysis regarding the existence of an arbitration agreement is not affected by how we categorize the online contract at issue here. "While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004).

"such clauses will be enforced provided they have been reasonably communicated and accepted." Id. at 611. The Appeals Court explained that "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." Id. at 612. (emphasis added) (internal quotations marks omitted) (quoting Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 35 (2d Cir. 2002)). With this in mind, the Appeals Court set forth a two-step inquiry for the enforceability of forum selection clauses in online agreements. The first inquiry is whether the contract terms were "reasonably communicated to the plaintiffs." Id. at 612. The second is whether the record shows that those terms were "accepted and, if so, the manner of acceptance." Id. at 613. The court further clarified that the burden to show that the terms were reasonably communicated and accepted lies on the party seeking to enforce the forum selection clause. See id. at 611.

With the legal framework determined, we proceed to our analysis keeping in mind that our sole focus is on the enforceability of Uber's mandatory arbitration clause found in the Agreement.

## A. Reasonable Notice

Uber makes no claim that any of the Plaintiffs actually saw the arbitration clause or even clicked on the "Terms of Service & Privacy Policy" button. Rather, it relies solely on a claim that its online presentation was sufficiently conspicuous as to bind the Plaintiffs whether or not they chose to click through the relevant terms. Therefore, we must determine whether the terms of the Agreement were "reasonably communicated" to the Plaintiffs. We note that "in the context of web-based contracts . . . clarity and conspicuousness are a function of the design and content of the relevant interface." Meyer v. Uber Techs., Inc., 868 F.3d 66, 75 (2d Cir. 2017).

Under Massachusetts law, "conspicuous" means that a terms is "so written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it." Mass. Gen. Laws ch. 106, § 1-201(b)(10); see also Mass. Gen. Laws ch. 156 D, § 1.40 (defining the term "conspicuous" as "written so that a reasonable person against whom the writing is to operate should have noticed it"). Whether or not a term is conspicuous is for the court to decide. Mass. Gen. Laws ch. 106, § 1-201(b)(10). Several nonexhaustive examples of general characteristics that make a term conspicuous include using larger and contrasting font, the use of headings in capitals, or somehow

setting off the term from the surrounding text by the use of symbols or other marks.  Id.

In addition, when the terms of the agreement are only available by following a link, the court must examine "the language that was used to notify users that the terms of their arrangement with [the service provider] could be found by following the link, how prominently displayed the link was, and any other information that would bear on the reasonableness of communicating [the terms]."  Ajemian, 987 N.E.2d at 612.

After reviewing the Uber App registration process, we find that the Plaintiffs were not reasonably notified of the terms of the Agreement.  We note at the outset that Uber chose not to use a common method of conspicuously informing users of the existence and location of terms and conditions: requiring users to click a box stating that they agree to a set of terms, often provided by hyperlink, before continuing to the next screen. Instead, Uber chose to rely on simply displaying a notice of deemed acquiescence and a link to the terms.  In order to determine whether that approach reasonably notified users of the Agreement, we begin our analysis with how this link was displayed.

Uber contends that the gray rectangular box with the language "Terms of Service & Privacy Policy" was reasonably conspicuous, both visually and contextually, because it was

displayed in a larger font, in bold, contrasting in color, and highlighted by the box around it. Furthermore, Uber argues that the screen contained a total of twenty-six words, making it difficult for a user to miss it.

While the language and the number of words found on the "Link Card" and "Link Payment" screens could be seen to favor Uber's position, the reading of Uber's "Terms of Service & Privacy Policy" hyperlink must be contextualized. That is, it may not be read in a vacuum. Other similarly displayed terms presented simultaneously to the user in both versions of the third screen diminished the conspicuousness of the "Terms of Service & Privacy Policy" hyperlink. We explain.

First, Uber's "Terms of Service & Privacy Policy" hyperlink did not have the common appearance of a hyperlink. While not all hyperlinks need to have the same characteristics, they are "commonly blue and underlined." CR Assocs. L.P. v. Sparefoot, Inc., No. 17-10551-LTS, 2018 WL 988056, at *4 n.4 (D. Mass. Feb. 20, 2018); see also e.g., Meyer, 868 F.3d at 78 ("[T]he hyperlinks are in blue and underlined."); Adelson v. Harris, 774 F.3d 803, 808 (2d Cir. 2014) ("[T]he hyperlinks were not hidden but visible in the customary manner, that is, by being embedded in blue, underlined text."); Fteja v. Facebook, Inc., 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) ("The phrase 'Terms of Service' is

underlined, an indication that the phrase is a hyperlink, a phrase that is 'usually highlighted or underlined' and 'sends users who click on it directly to a new location—usually an internet address or a program of some sort.'"). Here, the "Terms of Service & Privacy Policy" hyperlink was presented in a gray rectangular box in white bold text. Though not dispositive, the characteristics of the hyperlink raise concerns as to whether a reasonable user would have been aware that the gray rectangular box was actually a hyperlink.

Next, the overall content of the "Link Card" and "Link Payment" screens show that the "Terms of Service & Privacy Policy" hyperlink was not a conspicuous term as defined by Massachusetts law. Again, this hyperlink was displayed in white bold font within a gray rectangular box. While these features may have been sufficient to accentuate a hyperlink found within a registration process interface with a plain design and limited content, that was not the case here.

Along with the "Terms of Service & Privacy Policy" hyperlink, the "Link Card" and "Link Payment" screens contained other terms displayed with similar features. For example, the terms "scan your card" and "enter promo code" were also written in bold and with a similarly sized font as the hyperlink. Both versions of the third screen also included the words "CANCEL" and

"DONE," -- the latter being barely visible until the user had entered the required payment information -- in all capital letters and dark colored font.  Meanwhile, the top of the screens featured the terms "Link Card" or "Link Payment" in large capital letters and dark colored font.  These had the largest-sized font in both versions of the third screen.

Uber's "Terms of Service & Privacy Policy" hyperlink was even less conspicuous on the "Link Payment" screen.  The inclusion of the additional payment option and the placement of a large blue PayPal button in the middle of the screen were more attention-grabbing and displaced the hyperlink to the bottom of the screen.

It is thus the design and content of the "Link Card" and "Link Payment" screens of the Uber App interface that lead us to conclude that Uber's "Terms of Service & Privacy Policy" hyperlink was not conspicuous.  Even though the hyperlink did possess some of the characteristics that make a term conspicuous, the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention. If everything on the screen is written with conspicuous features, then nothing is conspicuous.  See Stevenson v. TRW Inc., 987 F.2d 288, 296 (5th Cir. 1993) (interpreting the Uniform Commercial Code's definition of the term "conspicuous" in the context of a disclaimer and

-23-

stating that a "disclaimer is not conspicuous . . . when it is the same size and typeface as the terms around it"); Boeing Airplane Co. v. O'Malley, 329 F.2d 585, 593 (8th Cir. 1964) (interpreting a state statute that contained a similar definition for the term "conspicuous" as the Massachusetts Uniform Commercial Code and finding that if a term "is merely in the same color and size of other type used for the other provisions," it fails to be a conspicuous term).

Furthermore, when we consider the characteristics of the text used to notify potential users that the creation of an Uber account would bind them to the linked terms, we note that this phrase was even less conspicuous than the "Terms of Service & Privacy Policy" hyperlink. This notice was displayed in a dark gray small-sized non-bolded font against a black background. The notice simply did not have any distinguishable feature that would set it apart from all the other terms surrounding it.

Because both the "Link Card" and "Link Payment" screens were filled with other very noticeable terms that diminished the conspicuousness of the "Terms of Service & Privacy Policy" hyperlink and the notice, we find that the terms of the Agreement were not reasonably communicated to the Plaintiffs. As such, Uber's motion to compel arbitration fails.

## IV. <u>Conclusion</u>

Because the Plaintiffs were not reasonably notified of the terms of the Agreement, they did not provide their unambiguous assent to those terms.  We therefore find that Uber has failed to carry its burden on its motion to compel arbitration.  For these reasons we reverse the district court's grant of Uber's motion to compel arbitration, and remand the case for further proceedings consistent with this opinion.

**<u>Reversed</u> and <u>Remanded</u>.**