NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1107-20

NANCY WOLLEN,

      Plaintiff-Appellant,

v.

GULF STREAM RESTORATION
AND CLEANING, LLC, GULF
STREAM ENTERPRISES, LLC,
JOSEPH JANAS, a/k/a JOSEPH
JANUS, JOSEPH LICHON,
and JUDITH A. LICHON,

      Defendants,

and

HOMEADVISOR, INC.,[1]

      Defendant-Respondent.

APPROVED FOR PUBLICATION

July 9, 2021

APPELLATE DIVISION

Argued June 3, 2021 – Decided July 9, 2021

Before Judges Fuentes, Whipple, and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-0900-18.

Gary Ahladianakis argued the cause for appellant (Carluccio, Leone, Dimon, Doyle & Sacks, LLC,

---

[1] Improperly pled as Angi HomeServices, Inc., d/b/a HomeAdvisor.

attorneys; Gary Ahladianakis, of counsel and on the briefs).

Jack Gross argued the cause for respondent.

The opinion of the court was delivered by

ROSE, J.A.D.

In this appeal, we consider an internet-based company's method of communicating its terms and conditions in the ever-evolving arena of online consumer contracts. At issue is the validity of an arbitration provision embedded in those terms and conditions that "could" be accessed via a hyperlink before plaintiff submitted her request for defendant's services. Because the defendant company did not demonstrate that the consumer plaintiff was on notice of the arbitration provision prior to submitting her service request through the website, we hold defendant failed to establish plaintiff was aware of the arbitration provision. Pursuant to our fact-intensive inquiry, we therefore conclude plaintiff did not knowingly and voluntarily agree to waive her right to resolve her disputes in court. Accordingly, we reverse the order under review that enforced arbitration, and remand for reinstatement of the complaint.

A-1107-20

I.

We summarize the facts from the limited record before the motion judge. Defendant HomeAdvisor, Inc. is an internet-based home improvement and maintenance referral service. Through its website, HomeAdvisor utilizes an online portal to provide consumers with "free referrals" for local third-party service providers. The consumer is not required to pay HomeAdvisor for its referral service; the fee is paid by the service providers, who have "register[ed] with HomeAdvisor and undergone an application and screening process."

In April 2017, plaintiff Nancy Wollen consulted the HomeAdvisor website seeking referrals for a contractor to renovate the newly purchased Beachwood home she shared with her family. Plaintiff selected HomeAdvisor after viewing the company's "daily" commercials that "saturated" the market and were "very convincing." Plaintiff rhetorically stated, "why would you go anywhere [else] because these people check the [contractors'] references, they do the work. You don't have to do anything except call the people they send you."

According to HomeAdvisor's Senior Vice President of Software Development, Chris Kucharski, website users must first create an online account to submit a service request through the company's online portal. That process

3

entails navigating multiple webpages. Screenshots of those webpages were annexed to Kucharski's certification.

Pertinent to plaintiff's service request, the initial six webpages sought information about the project, including its address, extent, and timing. To advance to each webpage, plaintiff was required to press the "Next" button. None of those six webpages referred the user to HomeAdvisor's separate terms and conditions webpage.

The top of the seventh and final webpage stated: "We have matching Home Renovation Contactors in your area! Get quotes from up to [four] prescreened pros now." Those statements were followed by fill-in-the-blank fields for the user's name, telephone number, and email address in the middle of the page. The user then encountered an optional check box preceding the statement, "Yes, I would like free project cost information." An orange button, entitled, "View Matching Pros" was situated under that statement, immediately followed by a single line of text, providing: "By submitting this request, you are agreeing to our Terms & Conditions." A reproduction of the seventh webpage appears below:

4

**We have matching Home Renovation Contractors in your area!**

Get quotes from up to 4 prescreened pros now.

First Name *

Last Name *

Phone *

Email *

✓ Yes, I would like free project cost information.

**View Matching Pros**

By submitting this request, you are agreeing to our Terms & Conditions.

According to Kucharski, "HomeAdvisor's website will not allow the submission of a service request unless the consumer or homeowner affirmatively clicks the [View Matching Pros] submit button, indicating that he or she agrees to the [t]erms and [c]onditions." It is undisputed that the phrase, "Terms & Conditions" was offset in blue font and acted as a hyperlink to a separate seven-page document, entitled "HomeAdvisor Terms and Conditions." The hyperlinked text did not contain any other explanatory terms, such as "Click Here to Accept [or Acknowledge, or Read, or View] the Terms & Conditions." Nor was the font of the phrase, "Terms & Conditions" underlined, bolded, or enlarged.

A-1107-20

Kucharski further certified: "All services provided to consumers by HomeAdvisor are provided pursuant to the [t]erms and [c]onditions set forth in a written online agreement." Containing eighteen paragraphs, the text of that "agreement" appears in smaller font than that of the seven webpages the user must navigate through before accessing it.[2]

Set forth on the final two pages of the HomeAdvisor Terms and Conditions webpage, the mandatory arbitration clause provided:

### 17. ARBITRATION AND GOVERNING LAW

The exclusive means of resolving any dispute between you and HomeAdvisor or any claim made by you or HomeAdvisor arising out of or relating to your use of this Website and/or HomeAdvisor's services (including any alleged breach of these Terms and Conditions) shall be **BINDING ARBITRATION** administered by the American Arbitration Association. The one exception to the exclusivity of arbitration is that you have the right to bring an individual claim against HomeAdvisor in a small-claims court of competent jurisdiction OR EXCEPT AS EXPRESSLY PROVIDED BY APPLICABLE FEDERAL OR STATE LAW. But whether you choose arbitration or small-claims court, you may not under any circumstances commence or maintain against HomeAdvisor any class action, class

---

[2] One day before plaintiff's deposition, Home Advisor made certain revisions to its terms and conditions, including revising the font to a larger size and including the following advisory: "IMPORTANT: PLEASE REVIEW THIS AGREEMENT CAREFULLY. IN PARTICULAR, PLEASE REVIEW THE MUTUAL ARBITRATION PROVISION IN SECTION 19."

A-1107-20

arbitration, or other representative action or proceeding.

**\*NOTICE OF RIGHTS\***

a. By using the Website and/or HomeAdvisor's services in any manner, you agree to the above arbitration agreement. In doing so, **YOU ALSO GIVE UP YOUR RIGHT TO GO TO COURT** to assert or defend any claims between you and HomeAdvisor (except for matters that may be taken to small-claims court). **YOU ALSO GIVE UP YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION OR OTHER CLASS PROCEEDING**. Your rights will be determined by a **NEUTRAL ARBITRATOR, NOT A JUDGE OR JURY**. You are entitled to a fair hearing before the arbitrator. The arbitrator can grant any relief that a court can, but you should note that arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons. For details on the arbitration process, see our Arbitration Procedures.[3]

b. Any proceeding to enforce this arbitration provision, including any proceeding to confirm, modify, or vacate an arbitration award, may be commenced in any court of competent jurisdiction. In the event that this arbitration provision is for any reason held to be unenforceable, any litigation against HomeAdvisor (except for small-claims court actions) may be commenced only in the federal or state courts located

---

[3] According to Kucharski, "Arbitration Procedures" appeared in maroon font and "constituted a hyperlink to a webpage displaying the full text of Home Advisor's [a]rbitration [p]rocedures." The record does not contain a copy of those procedures.

A-1107-20

in Denver County, Colorado. You hereby irrevocably consent to the jurisdiction of those courts for such purposes.

c. These Terms and Conditions, and any dispute between you and HomeAdvisor, shall be governed by the laws of the state of Colorado without regard to principles of conflicts of law, provided that this arbitration agreement shall be governed by the Federal Arbitration Act.

Absent from HomeAdvisor's terms and conditions is a signature line or electronic button requiring the user to "click-to-accept" those terms and conditions before returning to and clicking the View Matching Pros button. As such, the user may click the View Matching Pros button without ever viewing the terms and conditions containing the arbitration provision.

According to paragraph thirty-eight of Kucharski's amended certification:

[T]hroughout 2017 (and presently), nearly every webpage of HomeAdvisor's website directed toward consumers contained a hyperlink to the [t]erms and [c]onditions, presented in text such as, "By using HomeAdvisor, you agree to our Terms & Conditions" – with the hyperlinked blue text, "Terms & Conditions" leading a consumer directly to the full text of the version of the [t]erms [and] [c]onditions in effect at that time, including the arbitration clause and forum selection clause.

Screenshots of the webpages referenced in paragraph thirty-eight were not included in the record before the motion judge or this court. In any event,

Kucharski made no representations that the hyperlinked "Terms & Conditions" text that appeared on HomeAdvisor's other webpages required the consumer to accept those terms before continuing to the View Matching Pros submit button.

When deposed in September 2020, plaintiff said she did not recall clicking on the "Terms & Conditions" hyperlinked text before clicking on the View Matching Pros submit button. "Had [she] done so, [she] believe[d] [she] would recall that . . . ." Plaintiff also did not remember answering "a number of questions" on HomeAdvisor's website. According to plaintiff, she "usually scroll[s] to whatever is required to get . . . through the thing and [she] d[idn't] recall any specific obstacles." She repeatedly told counsel she did not recall "specifically" answering certain questions but "k[new] there was a series of steps that [she] went through that were in [her] mind reasonable."

Pursuant to HomeAdvisor's referral, on April 28, 2017, plaintiff retained defendant Gulf Stream Renovation and Cleaning, LLC or Gulf Stream Enterprises, LLC (Gulf Stream) to perform the work. Dissatisfied with Gulf Stream's services – after expending more than $97,000 – on April 13, 2018, plaintiff filed a complaint in the Law Division against Gulf Stream and its

9

principals, defendants Joseph Janas, a/k/a Joseph Janus or Joseph Lichon, and Judith A. Lichon.[4]

The following year, on April 8, 2019, plaintiff filed a second amended complaint adding HomeAdvisor as a defendant. Plaintiff asserted causes of action for breach of contract, violations of the New Jersey Consumer Fraud Act, property damage, fraud and unjust enrichment, negligence, and violations of the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act. Relevant here, plaintiff's breach of contract claim against HomeAdvisor alleged the company failed to:

> (1) make sure that the contractors and professionals referred to [p]laintiff had the applicable state-level trade licensing and qualifications; (2) perform [a] criminal background search in New Jersey of the actual owner or principal co-defendants; (3) use the necessary and available resources to check each business, including the co-defendants, listed on its website for bankruptcy filings, liens and significant state-level civil legal judgments; and (4) verify the true identity and social security number of the actual owner or principal of co-defendants to confirm their [sic] identity.

HomeAdvisor thereafter filed an answer and asserted various affirmative defenses. Citing the arbitration provision set forth in the terms and conditions, HomeAdvisor asserted as its first defense that the court lacked subject matter

---

[4] Gulf Stream and its principals are not parties to this appeal.

jurisdiction. Discovery ensued and in February 2020, HomeAdvisor moved to stay depositions, enforce the arbitration provision, and dismiss plaintiff's claims.[5]

The motion judge initially heard argument on March 13, 2020. Noting the absence of plaintiff's electronic signature, plaintiff's counsel argued there was no proof that plaintiff read or agreed to the terms and conditions. Citing Kucharski's certification, HomeAdvisor's counsel countered that plaintiff "ha[d] to click on 'it' in order to be referred to the[] contractors." The motion judge was not convinced, however, that "the process" required Home Advisor's users to read and acknowledge the terms and conditions prior to making payment.[6]

The judge carried the motion to permit defense counsel to supplement the record and to consider unrelated motions. On August 21, 2020, HomeAdvisor filed Kucharski's amended certification.

On October 16, 2020, the judge again held argument. Notably, HomeAdvisor's counsel acknowledged the company had no evidence that

---

[5] According to plaintiff's merits brief, plaintiff did not challenge HomeAdvisor's motion on delay or waiver grounds pursuant to an agreement between the parties.

[6] In her merits brief on appeal, plaintiff claims the judge was under the mistaken impression that she was required to pay HomeAdvisor for its services. Neither party corrected the judge during oral argument.

plaintiff "clicked on" the hyperlinked text that displayed the document stating the company's terms and conditions. Instead, HomeAdvisor argued whether plaintiff clicked on the hyperlink to the document was irrelevant here, where the hyperlink was "open," "obvious," and "clear," affording plaintiff "the opportunity to access and read and understand" the terms and conditions.

Defense counsel further argued that plaintiff's breach of contract cause of action underscored defendant's position that there was "some sort of contractual relationship between the parties . . . that [a]rose out of the terms and conditions of this website." Plaintiff's counsel maintained that the HomeAdvisor website fell far short of binding plaintiff because it did not require her to click on the terms and conditions before she was permitted to submit her request for contractors.

Focused on whether simply clicking on the Terms & Conditions hyperlink was "too onerous [on] the non-drafting party" to argue "there was no meeting[] of the minds" the judge again adjourned the motion and permitted the parties to supplement their briefing with any legislative guidance on the issue.

After considering oral argument on December 4, 2020, the judge rendered a decision from the bench. Pertinent to this appeal, the judge granted

HomeAdvisor's motion, concluding plaintiff's claims against it should be decided by an arbitrator.

Citing our Supreme Court's decision in Skuse v. Pfizer, Inc., 244 N.J. 30 (2020), the judge upheld defendant's method of communicating its terms and conditions to plaintiff.  The judge was persuaded that the "[hyper]link tab" was "clear and unmistakable" because it was "identified as terms and conditions."  And even if "plaintiff elected not to click" on the hyperlinked text, she was not exempt "from the obligation to comply with the terms and conditions of the contract."  The judge also found the arbitration provision "set forth in definite language the waiver of a jury trial."  Accordingly, the judge was "constrained, but compelled" to dismiss plaintiff's claims against HomeAdvisor and directed the parties to proceed to arbitration.  This appeal followed.

On appeal, plaintiff reprises the arguments she raised before the motion judge, primarily contending defendant failed to demonstrate she "clearly and unambiguously" assented to the arbitration provision set forth in HomeAdvisor's terms and conditions, and that the arbitration provision violated New Jersey's Plain Language Act, N.J.S.A. 56:12-1 to -13.  Because we agree that the method of delivery did not establish plaintiff agreed to the terms and conditions, including the arbitration provision, we need not reach plaintiff's plain language

challenge. We focus instead on HomeAdvisor's method of communicating the arbitration provision at issue.

## II.

We review de novo a trial court's order compelling or denying arbitration. Skuse, 244 N.J. at 46; Goffe v. Foulke Mgmt. Corp., 238 N.J. 191, 207 (2019). Accordingly, we need not defer to the trial court's "interpretative analysis" unless it is "persuasive." Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 316 (2019). "In reviewing such orders, we are mindful of the strong preference to enforce arbitration agreements, both at the state and federal level." Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 186 (2013). That preference, however, is not boundless. Id. at 187.

Consumer web-based contracts are no longer a novel concept. Indeed, New Jersey courts have recognized the validity of such contracts for decades. See, e.g., Skuse, 244 N.J. at 41-43; Hoffman v. Supplements Togo Mgmt., 419 N.J. Super. 596, 605-7 (App. Div. 2011); Caspi v. Microsoft Network L.L.C., 323 N.J. Super. 118, 124 (App. Div. 1999). As we stated in Hoffman: "Consumers are increasingly purchasing products and services over the internet. As those internet transactions have become more prevalent, so too have legal disputes proliferated over the contractual rights created in cyberspace between

14

buyers and sellers."   419 N.J. Super. at 605.   That prevalence has grown exponentially in the past ten years since Hoffman was decided – especially during the current pandemic – throughout the United States[7] and worldwide.[8]

Courts have observed the enforceability of an internet consumer contract often turns on whether the agreement is characterized as a "scrollwrap," "sign-in wrap," "clickwrap," or "browsewrap" – or a hybrid version of these electronic contract types.  See Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 394-401 (E.D. N.Y. 2015) (providing a detailed analysis of "wrap" contracts and their enforceability).   For example, a scrollwrap agreement "requires users to physically scroll through an internet agreement and click on a separate 'I agree' button in order to assent to the terms and conditions of the host website."  Id. at 395.  A sign-in wrap agreement "couples assent to the terms of a website with signing up for use of the site's services . . . ."  Ibid.

---

[7]   See, e.g., Charles Riley, Online shopping has been turbocharged by the pandemic.   There's no going back, CNN (Oct. 13, 2020 9:33 AM) https://www.cnn.com/2020/10/11/investing/stocks-week-ahead/index.html.

[8]   See e.g., COVID-19 has changed online shopping forever, survey shows, United Nations Conference on Trade Development (Oct. 8, 2020) https://unctad.org/news/covid-19-has-changed-online-shopping-forever-survey-shows.

A-1107-20

Clickwrap, "click-through" or "click-to-accept" as the name implies, requires "a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction." Skuse, 244 N.J. at 55, n.2 (quoting Feldman v. Google, Inc., 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007)). "Even though they are electronic, clickwrap agreements are considered to be writings because they are printable and storable." Ibid. (quoting Feldman, 513 F. Supp. 2d at 236). "Such agreements are routinely enforced by the courts." Ibid. (quoting HealthPlanCRM, LLC v. AvMed, Inc., 458 F. Supp. 3d 308, 334 (W.D. Pa. 2020)).

Conversely, a browsewrap agreement generally "exists where the online host dictates that assent is given merely by using the site." Berkson, 97 F. Supp. 3d at 394. Unlike clickwrap agreements, "browsewrap agreements do not require users to expressly manifest assent." James v. Global Tel*Link Corp., 852 F.3d 262, 267 (3d Cir. 2017). For that reason, the enforceability of browsewrap agreements may "turn[] on whether the terms or a hyperlink to the terms are reasonably conspicuous on the webpage." Ibid. In the present case, HomeAdvisor's terms and conditions can best be described as a browsewrap-type agreement.

Regardless of a web-based agreement's characterization, however, the pertinent inquiry is whether the user was provided with reasonable notice of the applicable terms, based on the design and layout of the website. See Hoffman, 419 N.J. Super. at 611. In that regard, internet contracts are not all that different from traditional, written contracts containing arbitration provisions.

We therefore turn to well-settled principles underpinning arbitration agreements. As our Supreme Court has repeatedly recognized, the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, "permits states to regulate . . . arbitration agreements under general contract principles." Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 441 (2014) (quoting Martindale v. Sandvik, Inc., 173 N.J. 76, 85 (2002)). Under, section 2 of the FAA, arbitration provisions may be invalidated "upon such grounds as exist at law or in equity for the revocation of any contract." Martindale, 173 N.J. at 85 (quoting 9 U.S.C. § 2); see also Leodori v. CIGNA Corp., 175 N.J. 293, 302 (2003) ("[A] state is permitted to regulate agreements, including those that relate to arbitration, by applying its contract-law principles that are relevant in a given case").

When reviewing a motion to compel arbitration, courts apply a two-pronged inquiry: (1) whether there is a valid and enforceable agreement to arbitrate disputes; and (2) whether the dispute falls within the scope of the

17

agreement.  Martindale, 173 N.J. at 83.  The present appeal implicates the first inquiry.

"An agreement to arbitrate, like any other contract, 'must be the product of mutual assent, as determined under customary principles of contract law.'" Atalese, 219 N.J. at 442 (quoting NAACP of Camden Cnty. E. v. Foulke Mgmt. Corp., 421 N.J. Super. 404, 424 (App. Div. 2011)).  Unless the parties have agreed to arbitrate their claims, they are not required to do so.  Ibid.  The United States Supreme Court has long recognized this principle.  See Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989) (stating the "FAA does not require parties to arbitrate when they have not agreed to do so").

"[B]ecause arbitration involves a waiver of the right to pursue a case in a judicial forum, 'courts take particular care in assuring the knowing assent of both parties to arbitrate, and a clear mutual understanding of the ramifications of that assent.'"  Atalese, 219 N.J. at 442-43 (quoting Foulke Mgmt., 421 N.J. Super. at 425).  "The point is to assure that the parties know that in electing arbitration as the exclusive remedy, they are waiving their time-honored right to sue." Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282 (1993).

An arbitration provision is not enforceable unless the consumer has reasonable notice of its existence. See Hoffman, 419 N.J. Super. at 609. In Hoffman, we reversed the trial court's dismissal of the consumer plaintiff's complaint based on a forum selection clause contained within a disclaimer on the defendant's website. Id. at 598. Because the disclaimer was "submerged" at the bottom of the webpage, we held the plaintiff did not have reasonable notice of the clause. Id. at 611.

Notably, by clicking on an item advertised on the website, and adding it to the user's "'shopping cart,' the webpage would skip ahead to new pages that d[id] not contain the disclaimer." Ibid. Accordingly, we reasoned "the forum selection clause was unreasonably masked from the view of the prospective purchasers because of its circuitous mode of presentation." Ibid.

In reaching our decision in Hoffman, we distinguished our earlier decision in Caspi. There, the defendant's "membership agreement appear[ed] on the computer screen in a scrollable window next to blocks providing the choices 'I Agree' and 'I Don't Agree.'" Caspi, 323 N.J. Super. at 122. Those choices were clickable "at any point while scrolling through the agreement." Ibid. Prospective subscribers could not advance to the next stage of registration without affirmatively agreeing to the membership agreement, which included a

forum selection clause.  Ibid.  We therefore held the manner of conveying the agreement and manifesting assent bound the user to the terms, including the forum selection clause set forth at the bottom of the agreement.  Id. at 125-26.

As we did in Hoffman, we continue to find instructive the Second Circuit's nearly twenty-year-old decision in Specht v. Netscape Commc'ns Corp., 306 F.3d 17 (2d Cir. 2002).  In Specht, then Circuit Judge (now Justice) Sotomayor held the consumer plaintiffs were not placed on reasonable notice of an arbitration clause when they downloaded free software from the defendant's webpage.  Id. at 20.  The arbitration clause at issue was displayed only by accessing a hyperlink that brought the user to another webpage, entitled "License & Support Agreements."  Id. at 23-24.  But the hyperlink was only visible had the user "scrolled down the webpage to a screen located below the download button" to an "invitation" that read:  "Please review and agree to the terms of the Netscape SmartDownload software license agreement before downloading and using the software."  Id. at 20, 23.

Accordingly, the plaintiffs in Specht "were required neither to express unambiguous assent to that program's license agreement nor even to view the license terms or become aware of their existence before proceeding with the invited download of the free plug-in program."  Id. at 23.  In sum, the court

20

concluded that where the arbitration clause was not visible before the users clicked the icon to download the program but was "submerged" elsewhere on the website, the users could not be said to have given consent. Id. at 31-32. Instead, the court held "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms . . . [is] essential if electronic bargaining is to have integrity and credibility." Id. at 35.

More recently, when considering whether an internet user was placed on reasonable notice of the terms of an online agreement, federal and state courts have reached varying results. Compare Cullinane v. Uber Techs., Inc., 893 F.3d 53, 62-63 (1st Cir. 2018) (holding the "Terms of Service & Privacy Policy" hyperlink in white text against a black background did not provide reasonable notice, reasoning in part that "[w]hile not all hyperlinks need to have the same characteristics, they are 'commonly blue and underlined'") and Kauders v. Uber Techs., Inc., 159 N.E.3d 1033, 1051-52 (Mass. 2021) (declining to find reasonable notice where the defendant's online registration process included the instruction: "By creating an Uber account, you agree to the Terms & Conditions and Privacy Policy," which included a hyperlink) with Meyer v. Uber Techs., Inc., 868 F.3d. 66, 78 (2d Cir. 2017) (concluding that the language, "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY

21

POLICY," which was hyperlinked, in very small font below the registration buttons in Uber's application provided reasonable notice of the contract terms) and Major v. McCallister, 302 S.W.3d 227, 230-31 (Mo. Ct. App. 2009) (finding reasonable notice was satisfied where the defendant's website placed the text: "'By submitting you agree to the Terms of Use' and a blue hyperlink . . . right next to the button that [the user] pushed").

Nonetheless, federal and state courts deciding whether an internet user was placed on "reasonable notice" of the terms of an online agreement have consistently applied a "fact-intensive inquiry." Sgouros v. TransUnion Corp., 817 F.3d 1029, 1034-35 (7th Cir. 2016); Kauders, 159 N.E.3d at 1049 (quoting Meyer, 868 F.3d at 76). While no New Jersey case appears to address the precise factual scenario before us, we similarly adopt a fact-intensive inquiry to guide our analysis of the legal issue presented. See Waskevich v. Herold Law, P.A., 431 N.J. Super. 293, 298 (App. Div. 2013) (internal quotation marks omitted) (stating "courts examine arbitration provisions on a case-by-case basis").

Our Supreme Court's decision in Skuse reflects an analysis of facts and circumstances that are inapposite to those in the present consumer contract matter. Unlike the motion judge, we are therefore not persuaded that Skuse compels us to validate the arbitration agreement here.

In Skuse, the Court upheld an arbitration agreement and class waiver agreement (Agreement) that was disseminated by the corporate employer to its employees via notification to the corporate email accounts. 244 N.J. at 37. The plaintiff "opened e-mails that linked to the Agreement, completed a 'training module' regarding the arbitration policy, and clicked a box on her computer screen that asked her to 'acknowledge' her obligation to assent to the Agreement as a condition of her continued employment after sixty days." Id. at 36.

The first email specifically stated that under the Agreement, the employer and employee mutually agreed to arbitration and included a link to the Agreement, which listed several "Frequently Asked Questions." Id. at 39. The second email expressly advised the employees that they were assigned to complete an "activity" entitled, "Mutual Arbitration and Class Waiver Agreement and Acknowledgement." Id. at 40. The second email further stated: "It is important that you are aware of the terms of this Agreement." Ibid. Included in this email was a link to the agreement module, which consisted of four slides. Ibid. "Just below the language set forth [in the third slide], a box with an arrow pointing to that [slide's] language instructed the employee to 'CLICK HERE to acknowledge.'" Id. at 41.

In upholding the validity of the electronic method of notification – and the enforceability of the arbitration provision transmitted therein – the Court discerned "nothing in the e-mailed communications . . . concealed the Agreement or understated its purpose." Id. at 56. There, however, the employer "highlighted that Agreement in two e-mails to the employees concerned." Indeed, "[e]ach e-mail provided a conspicuous link to the Agreement itself." Ibid. And the employee was required to view the training module and acknowledge that his or her continued employment beyond sixty days constituted acceptance. Id. at 36.

The facts and circumstances of the present matter are inapposite to those in Skuse. Initially, unlike the employer-employee relationship that was established between the parties in Skuse, the parties in the present matter had no relationship, employment or otherwise. As the Court has repeatedly recognized in arbitration disputes: "The consumer context of the contract matter[s]. Kernahan, 236 N.J. at 320 (citing Atalese, 219 N.J. at 444). Unlike the employer in Skuse, the internet defendant here did not send an email to the consumer plaintiff notifying her that action was required to view and acknowledge the arbitration provision."

Further, consumers who utilize the internet to purchase goods and services run the gamut from those who are tech-savvy to those who are unsophisticated, and who can thus be said to constitute the "reasonably prudent Internet user." See Specht, 306 F.3d at 20. In our view, the hyperlink at issue did not provide reasonable notice of HomeAdvisor's terms and conditions to the reasonably prudent internet user. Although the terms of the hyperlink, "Terms & Conditions" were displayed in "blue font" against a white background, those terms were not underlined, bolded, or enlarged. Thus, we disagree with the motion judge that the hyperlink was "clear and unmistakable."

Moreover, absent from the hyperlink's wording was any indication that the user was required to read the terms and conditions before submitting her request for service professionals. For example, the hyperlink did not contain any directive to "click here" to accept – or acknowledge, or read, or view – the terms and conditions before submitting a request. Indeed, the statement, "By submitting this request, you are agreeing to our Terms & Conditions," was situated below the View Matching Pros submission button. Accordingly, the user could submit her request before reading the text. Or the user might expect to view the terms and conditions after her request was submitted. In that regard,

25

we agree with plaintiff that the hyperlink was "vague, ambiguous and misleading."

Most significant, however, is the distinction between the manner of acceptance in the present matter and that in Skuse. Here, plaintiff was not required to affirmatively assent – or even view – the terms and conditions. HomeAdvisor did not require plaintiff to open, scroll through, or acknowledge the terms and conditions by "clicking to accept" or checking a box that she viewed them before clicking the View Matching Pros submit button. As such, there existed no prerequisite to matching plaintiff with third-party contractors; HomeAdvisor did so regardless of whether plaintiff was aware of the parties' purported agreement. Thus, there is no evidence in the record that plaintiff viewed, let alone, accepted HomeAdvisor's terms and conditions before placing her service request. See Specht, 306 F.3d at 23.

We therefore conclude HomeAdvisor failed to establish plaintiff assented to its terms and conditions, including the arbitration provision at issue, which was masked behind a layer of webpages. As we have recognized in the context of whether multiple writings constitute a single contract: "In order for there to be a proper and enforceable incorporation by reference of a separate document . . . the party to be bound by the terms must have had 'knowledge of and assented

to the incorporated terms.'"  Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 410 N.J. Super. 510, 533 (App. Div. 2009) (quoting 4 Williston on Contracts § 30:25 (Lord ed.1999)).  That knowledge and assent was absent here.

Our decision should not be interpreted to suggest that a consumer contract cannot be formed by reference to a hyperlinked document, or that we are invalidating browsewrap agreements in toto.  At the very least, however, the internet user should be directed in words – and not just by font of a different hue – to click on that hyperlink.  In the alternative, the hyperlinked document, itself, should contain some semblance of an acknowledgment, or inability to submit a request unless the user scrolls through the terms and conditions at issue.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1107-20