Filed 12/30/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TINA SELLERS et al., | D077868 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2020-00005869-CU-BT-CTL) |
| JUSTANSWER LLC, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge. Affirmed.

Gaw Poe, Randolph Gaw and Flora Vigo for Defendant and Appellant.

Dostart Hannink & Coveney, James T. Hannink and Zach P. Dostart for Plaintiffs and Respondents.

INTRODUCTION

JustAnswer LLC (JustAnswer) appeals from an order denying its petition to compel arbitration. Tina Sellers and Erin O'Grady (together, Plaintiffs) used the JustAnswer website to submit a single question to an "expert" for what they believed would be a one-time fee of $5, and JustAnswer automatically enrolled them in a costlier monthly membership. After discovering additional charges to their credit cards, Plaintiffs filed a

class action lawsuit against JustAnswer, alleging it routinely enrolled online consumers like them in automatic renewal membership programs without providing "clear and conspicuous" disclosures and obtaining their "affirmative consent" as mandated by the Automatic Renewal Law (Bus. & Prof. Code,[1] § 17600 *et seq*.; the ARL).  (§ 17602, subds. (a)(1) and (a)(2).)

Seeking to avoid the class action litigation, JustAnswer filed a petition to compel individual arbitration.  JustAnswer claimed Plaintiffs agreed to their "Terms of Service," which included a class action waiver and a binding arbitration clause, when they entered their payment information on the website and clicked a button that read, "Start my trial."  The following textual notice appeared in very small print further down the page below the "Start my trial" button:  "By clicking 'Start my trial' you indicate that you agree to the terms of service and are 13+ years old."  The underlined "terms of service" was a hyperlink[2] to a separate webpage that displayed the 26-page-long terms of service.  Plaintiffs asserted they were not bound by the arbitration provision because the textual notice was not sufficiently conspicuous to establish they had constructive notice of the terms of service. The trial court found Plaintiffs had not agreed to binding arbitration "[b]ased on the inconspicuous language" in JustAnswer's notice and denied its petition to compel arbitration.

In a case of first impression under California law, we consider whether and under what circumstances a "sign-in wrap" agreement—the manner in

---

[1]    All further statutory references are to the Business and Professions Code, unless otherwise indicated.

[2]    In the computing world, a hyperlink is a word, phrase, or image—typically underlined or in blue font—that the user can click on to jump to a new document or a new section within the current document.

which JustAnswer sought to impose contractual terms on consumers over the internet—is valid and enforceable. As we shall explain, the full context of any transaction is critical to determining whether any particular notice is sufficient to put a consumer on inquiry notice of contractual terms contained on a separate, hyperlinked page. Here, the transaction involved a $5 "trial" that automatically enrolled allegedly unwitting consumers in a more expensive recurring monthly membership. This is precisely the type of transaction from which the Legislature intended to protect consumers when it enacted the ARL. (§§ 17600, 17602.) And since the Legislature has specifically addressed the issue of consumers being unwittingly entered into automatically recurring memberships, we consider the notice requirements the Legislature has imposed in such transactions when evaluating the sufficiency of JustAnswer's textual notice.

Doing so, we conclude the notices on the "Start my trial" screens of the JustAnswer website were not sufficiently conspicuous to bind Plaintiffs, because they were less conspicuous than the ARL's statutory notice requirements and they were not sufficiently conspicuous under other criteria courts have considered in determining whether a hyperlinked notice to terms of services is sufficient to put a user on inquiry notice of an arbitration agreement. We therefore affirm the trial court's order denying JustAnswer's petition to compel arbitration.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Complaint*

JustAnswer operates a website, www.justanswer.com, on which users can ask "experts" to answer questions on a wide variety of topics, including, among others, medical, legal, tax, veterinary, computer, and electrical. Users

3

can access the JustAnswer website on a standard computer, such as a desktop or laptop, or a mobile device. When a user first accesses the JustAnswer website, they are informed they can "[t]alk to doctors, lawyers, vets, [and] more in minutes" and are presented with a box where they can type a question.[3] There is no mention of cost, but, if the user enters a question in the box and clicks "Continue," they are taken to a payment page.

---

[3] The facts in this case are largely undisputed. Our description of the JustAnswer website and the user sign-up process reflect the website as it was when Plaintiffs accessed it in May and October 2019.

4

If a user accesses the JustAnswer website on a desktop or laptop computer, the payment page looks like this:





As shown in the image, the page states, in fairly large white print against a dark background, "Join for $5 and get your answer in minutes." Below, in smaller print, it says: "Unlimited conversations with doctors—try 7 days for just $5. Then $46/month. Cancel anytime." Below that, there is a white box with fields for the user to enter their credit card information and an email address. Below those fields is an orange button that says, "Start my

trial." Next to the button, the user is told: "Cancel anytime. [¶] We'll remind you one day before trial ends." Below the button and outside the white box, in very small print, there is an additional advisement that reads, "By clicking 'Start my trial' you indicate that you agree to the <u>terms of service</u> and are 13+ years old." The underlined "<u>terms of service</u>" is a hyperlink that takes the user to another webpage with approximately 26 pages of terms, including, among others, a binding arbitration clause, a class action waiver, and a disclaimer that JustAnswer does not "guarantee any particular level of expertise" from their experts. The user is not required to actually view the hyperlinked terms of service in order to begin using JustAnswer's service. Once a user submits their payment information and clicks on the "Start my trial" button, they are automatically enrolled in a recurring monthly membership.

If a user accesses the website on a mobile device, they see a payment page like this:



Similar to the computer version, there is fairly large white print against a dark background instructing the user they can "Join for $5" and "get [their] answer in minutes." Below that, there are several fields to enter payment information and a large orange button that reads, "Start my trial." Below the button, in smaller white print, is the following text: "Try 7 days for $5. Then $28/mo. Cancel anytime. We'll remind you before trial ends."

7

And below that, in even smaller, grey print, it states, "By clicking 'Start my trial' you indicate that you agree to the Terms of Service, Privacy Policy and are over 13 years old." Both the "Terms of Service" and "Privacy Policy" are hyperlinks to separate pages containing the respective terms, including a binding arbitration clause and class action waiver, and privacy policy. As with the computer version, the user is not required to actually view the hyperlinked terms of service in order to click "Start my trial" and begin using JustAnswer's service.

In addition, users on mobile devices are directed to the following screen once the response to their initial question is ready:



The screen includes another large orange button that reads "View response," and below that is a checkbox followed by the statement, in smaller

white font, "I agree to the <u>Disclaimer and re-agree to the Terms of Service</u>." The underlined text "<u>Disclaimer and re-agree to the Terms of Service</u>" is a hyperlink that leads the user to another page with a series of disclaimers, but not to the terms of service containing the arbitration clause. Rather, the hyperlinked page contains two separate sets of disclaimers and, after each, states, "You can read more about these policies in our Terms of Service." The words "Terms of Service" appear in blue font and are hyperlinks to the same terms of service page linked on the payment screens. Here, the user must check the box next to the statement in order to view the response to their question. However, the user does not need to actually click on and view the hyperlinked pages containing either the disclaimers or the terms of service in order to check the box or to continue using JustAnswer's service.

If the user does click on the hyperlinked terms of service, the following arbitration clause appears on the second page, in bold font and capitalized lettering:

"PLEASE NOTE THAT THESE TERMS PROVIDE THAT IF YOU AND JUSTANSWER ARE UNABLE TO RESOLVE ANY DISPUTES THAT ARISE EITHER INFORMALLY OR THROUGH MEDIATION, THE DISPUTE WILL BE RESOLVED BY BINDING ARBITRATION. ARBITRATION USES A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY AND IS SUBJECT TO VERY LIMITED REVIEW BY COURTS. YOU AND JUSTANSWER ALSO AGREE THAT ANY CLAIMS OR DISPUTES CANNOT BE BROUGHT AS A CLASS ACTION. PLEASE CAREFULLY REVIEW THE DISPUTE RESOLUTION SECTION BELOW. IF YOU DO NOT ACCEPT THE

ARBITRATION PROVISION BELOW, YOU MAY NOT USE

THE SITE." (Boldface omitted.)

Although the arbitration clause purports to bind the user, the terms of service elsewhere indicate that "JustAnswer may modify any of the [t]erms at any time by posting them on the [JustAnswer website]."

O'Grady accessed the JustAnswer website on a laptop computer in May 2019 and Sellers accessed the JustAnswer website on a mobile phone in October 2019. Each submitted a single question and provided payment information with the expectation that they would be charged a one-time fee of $5 to have their question answered by an "expert," and that they would not be charged if they were not satisfied with the answer they received. Neither was satisfied with the answer they received, and both thought they should not be charged. Sellers notified a JustAnswer online representative and was told she could receive a more complete answer for an additional charge of $39. She declined that option and, at that point, believed she had concluded all business dealings with JustAnswer. O'Grady "notified the 'expert' " that she was not satisfied with her answer and, likewise, believed she had concluded all business dealings with JustAnswer.

However, JustAnswer charged each of their credit cards a monthly fee of $46 for several months before Plaintiffs discovered and disputed the charges. Sellers contested the charges with JustAnswer and was refunded a total of $138. O'Grady disputed the charges with her credit card company and obtained a credit for $230. Neither received a refund for their initial $5 "trial" payment.

In January 2020, Plaintiffs filed a class action lawsuit on behalf of all individuals in California that were similarly enrolled in a "trial" on the JustAnswer website and were subsequently charged for an automatically

10

renewing monthly membership. Plaintiffs alleged they were "not the only consumers to be victimized" by JustAnswer; rather, "[t]here are hundreds of customer complaints about JustAnswer posted on various consumer websites, including the Better Business Bureau ('BBB') website, which illustrate that [JustAnswer's] scheme has affected many consumers." They cited examples of consumers who complained to the BBB that they were "duped into a membership" when they "thought [they were] paying $5 . . . to have a . . . question answered." On behalf of the putative class, Plaintiffs alleged JustAnswer violated the ARL, the Consumers Legal Remedies Act (Civ. Code, § 1750 *et seq*.; the CLRA), and the Unfair Competition Law (§ 17200 *et seq*.; the UCL).

As set forth in the complaint, the Legislature enacted the ARL in 2009, finding that:

> "It has become increasingly common for consumers to complain about unwanted charges on their credit cards for products or services that the consumer did not explicitly request or know they were agreeing to. Consumers report they believed they were making a one-time purchase of a product, only to receive continued shipments of the product and charges on their credit card. These unforeseen charges are often the result of agreements enumerated in the 'fine print' on an order or advertisement that the consumer responded to."

(Sen. Jud. Com., Analysis of Sen. Bill. No. 340 (2009–2010 Reg. Sess.) as amended Apr. 2, 2009, p. 4.) The ARL states that "[i]t is the intent of the Legislature to end the practice of ongoing charging of consumer credit or debit cards . . . without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." (§ 17600.)

To achieve its purpose, the ARL makes it unlawful for a business to enroll a customer in an automatic renewal or continuous service agreement without presenting the service terms to the customer in a "clear and

11

conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity . . . to the request for consent to the offer." (§ 17602, subd. (a)(1).) It defines " 'clear and conspicuous' " to mean "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." (§ 17601, subd. (c).) The ARL also makes it unlawful for a business to charge the customer's credit or debit card "without first obtaining the consumers' affirmative consent" to the automatic renewal or continuous service agreement. (§ 17602, subd. (a)(2).)

Plaintiffs alleged JustAnswer violated the ARL, CLRA, and UCL by "enroll[ing] consumers in automatic renewal membership programs without providing the 'clear and conspicuous' disclosures mandated by California law, and post[ing] charges to consumers' credit or debit cards for purported membership charges without first obtaining the consumers' affirmative consent to an agreement containing the requisite clear and conspicuous disclosures."

## II.

### *JustAnswer's Petition to Compel Arbitration*

In response to Plaintiffs' complaint, JustAnswer petitioned to compel individual arbitration. It asserted Plaintiffs agreed to binding arbitration by clicking the "Start my trial" button on the JustAnswer website, thereby indicating their agreement to its terms of service containing the arbitration clause and, in the case of the mobile version, by checking the box and "re-agree[ing]" to the terms of service before viewing the response to their initial question.

Plaintiffs opposed the petition, asserting they were not bound by the arbitration provision because there was no evidence they had actual notice of the terms and the notice provisions were not sufficiently conspicuous to provide constructive notice. They argued the notices on the "Start my trial" pages were not immediately adjacent to the "Start my trial" buttons; the text was "tiny," "faint," and "set against a background lacking significant contrast"; and the hyperlinks were not in a different color, "contrary to customary website design practice." In addition, Plaintiffs asserted, "taken as a whole, the screen gives the impression that by clicking on the 'Start my trial' button, a consumer is simply authorizing JustAnswer to charge $5.00 to the [consumer's] credit card, which the consumer has just finished inputting into the payment fields." Thus, "the mere act of clicking 'Start my trial' is not an unambiguous manifestation of assent to the terms." Plaintiffs further asserted the text on the "View response" mobile screen was similarly very small and without color contrast, and that the hyperlink took users to a " 'Disclaimer' " page, rather than the terms of service page.

The trial court examined the screenshots of both the computer and mobile versions of the "Start my trial" page on the JustAnswer website and the mobile "View Response" page. It found the font of the terms of service notices was "tiny, smaller than any other printing on the screen," the print was "faint, set against a background lacking significant contrast," and there was "no color contrast between the terms of service hyperlink and the other text in that sentence." The court also found "[t]he terms of service hyperlink and its associated sentence [were] not immediately adjacent to the 'Start my trial' button, but instead [were] at a location that is not suggestive of any connection between them." Further still, the court found the "View Response" page contained a hyperlink that took them to a disclaimer page

13

regarding liability for the expert advice, and not directly to the terms of service. The court concluded Plaintiffs had not agreed to binding arbitration "[b]ased on the inconspicuous language" and denied JustAnswer's petition to compel arbitration.

JustAnswer timely appealed.

## DISCUSSION

### I.

### *General Principles in Determining the Existence of an Enforceable Agreement to Arbitrate*

"While [i]nternet commerce has exposed courts to many new situations, it has not fundamentally changed the requirement that ' "[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." ' " (*Long v. Provide Commerce, Inc.* (2016) 245 Cal.App.4th 855, 862 (*Long*).) Mutual assent, or consent, of the parties "is essential to the existence of a contract" (Civ. Code, § 1550; see also Civ. Code, § 1565), and "[c]onsent is not mutual, unless the parties all agree upon the same thing in the same sense" (Civ. Code, § 1580). "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141; accord *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 810–811 (*Weddington*).) "The parties' outward manifestations must show that the parties all agreed 'upon the same thing in the same sense.' (Civ. Code, § 1580.) If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no

mutual consent to contract and no contract formation.  (Civ. Code, §§ 1550, 1565 & 1580.)"  (*Weddington*, at p. 811.)

"This principle of knowing consent applies with particular force to provisions for arbitration" (*Windsor Mills, Inc. v. Collins & Aikman Corp.* (1972) 25 Cal.App.3d 987, 993 (*Windsor Mills*)), including arbitration provisions contained in contracts purportedly formed over the internet (*Long*, *supra*, 245 Cal.App.4th at p. 862).  "Under both federal and state law, the threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate."  (*Cheng-Canindin v. Renaissance Hotel Associates* (1996) 50 Cal.App.4th 676, 683.)  "Indeed, a trial court has no power to order parties to arbitrate a dispute that they did not agree to arbitrate."  (*Bouton v. USAA Casualty Ins. Co.* (2008) 43 Cal.4th 1190, 1202; see also, Code Civ. Proc., § 1281.2 ["the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists"].)  While California public policy favors arbitration, " ' "there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate." ' " (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744.)  Thus, whether the terms appear on a physical piece of paper or a computer screen, "California law is clear—'an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious.' " (*Long*, at p. 862, quoting *Windsor Mills*, at p. 993.)

In the world of paper contracting, the outward manifestation of assent to the *same thing* by both parties is often readily established by the offeree's receipt of the physical contract.  (See *California State Automobile Assn. Inter-Insurance Bureau v. Barrett Garages, Inc.* (1967) 257 Cal.App.2d 71, 76

15

(*Barrett Garages*) ["[T]he general rule is that a person is bound by the printed contractual provisions of an instrument which he accepts delivery of *if*, as an ordinarily prudent [person], he could and should have read such provisions."]; see also *Specht v. Netscape Communications Corp.* (2d Cir. 2002) 306 F.3d 17, 31 (*Specht*) [Under California contract law, the "receipt of a physical document containing contract terms or notice thereof is frequently deemed, in the world of paper transactions, a sufficient circumstance to place the offeree on inquiry notice of those terms."].)

By contrast, when transactions occur over the internet, there is no face-to-face contact and the consumer is not typically provided a physical copy of the contractual terms. In that context, and in the absence of actual notice, a manifestation of assent may be inferred from the consumer's actions on the website—including, for example, checking boxes and clicking buttons—but any such action must indicate the parties' assent to the *same thing*, which occurs only when the website puts the consumer on constructive notice of the contractual terms. (See *Nguyen v. Barnes & Noble Inc.* (9th Cir. 2014) 763 F.3d 1171, 1177 (*Nguyen*) [validity of an internet agreement "turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract"].) Thus, in order to establish mutual assent for the valid formation of an internet contract, a provider must first establish the contractual terms were presented to the consumer in a manner that made it apparent the consumer was assenting to those very terms when checking a box or clicking on a button. (*Ibid.*)

A party seeking to compel arbitration "bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.) Under traditional contract principles, where there is no dispute as to

16

the material facts, "the existence of a contract is a question [of law] for the court to decide."[4] (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208.) Where, as here, the trial court denies a petition to compel arbitration based on the threshold issue of the existence of a contract, and the evidence of the alleged contract formation consists primarily of undisputed screenshots of the website at issue, our review is de novo. (See *Long, supra,* 245 Cal.App.4th at pp. 861, 863; *Bono v. David* (2007) 147 Cal.App.4th 1055, 1061–1062 (*Bono*) ["Where there is no 'factual dispute as to the language of the agreement' [citation] or 'conflicting extrinsic evidence' regarding the terms of the contract [citation], our standard of review of a trial court order granting or denying a motion to compel arbitration under section 1281.2 is de novo."].)

Before considering whether there is mutual assent by the parties to the arbitration provision at issue here, we first turn to the various ways contracts are formed over the internet and, from which, assent is inferred.

II.

*Contract Formation Over the Internet*

A significant portion of consumer transactions for both goods and services now occur over the internet, and providers of websites offering those goods and services frequently seek to impose contractual terms on consumers. (See *Selden v. Airbnb, Inc.* (D.D.C., Nov. 1, 2016, No 16-cv-00933 (CRC)) 2016

---

4      In its petition to compel arbitration, JustAnswer asserted that Idaho law applied pursuant to a choice-of-law provision contained in the terms of service at issue here. On appeal, however, JustAnswer concedes California law governs the formation of contracts. We agree with this concession that courts generally apply state law principles governing the formation of contracts when deciding whether an agreement to arbitrate exists in the first instance. (See *Specht, supra,* 306 F.3d at p. 22, fn. 4; *Perry v. Thomas* (1987) 482 U.S. 483, 492, fn. 9.)

17

WL 6476934 at *5 (*Selden*) ["The act of contracting for consumer services online is now commonplace in the American economy."].) As a result, providers of online goods and services have developed various ways to purportedly bind consumers to contractual terms in transactions done over the internet.

Even before the rise of internet transactions, software providers included contractual terms of use in their packaging. (Femminella, *Online Terms and Conditions Agreements: Bound by the Web* (2003) 17 St. John's J. Legal Comment. 87, 88 [*Femminella*].) These agreements, which restricted how the software could be used and provided protection from widespread illegal copying, came to be "called shrink-wrap licenses [fn. omitted] because although the packaging contains notice of the agreement inside, the entire agreement can only be viewed after buying the product and breaking through the plastic shrink-wrap packaging." (*Id.* at pp. 88–89.) Courts have characterized such licenses as contracts of adhesion, since they are offered on a "take-it-or-leave-it basis," but have generally found them to be enforceable if consistent with the reasonable expectations of the consumer. (See *DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 716.)

As consumers began downloading software from websites, agreements similar to shrink-wrap licenses began to appear online. (*Femminella, supra,* 17 St. John's J. Legal Comment. at p. 89.) But since there is no packaging on the internet, there was no way for providers to include a physical copy of the contractual terms. Instead, providers would ask customers to agree to the terms, displayed somewhere on their website, by clicking on an " 'I accept' " or " 'I agree' " button. (*Id.* at p. 89, fns. 10, 11.) This type of agreement became known as a " 'clickwrap' " agreement, "by analogy to 'shrinkwrap,' used in the

18

licensing of tangible forms of software sold in packages[,] because it 'presents the user with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the license agreement by clicking on an icon.' " (*Specht*, *supra*, 306 F.3d at p. 22, fn. 4.) In most instances, the contractual terms were not actually displayed on the same screen as the " 'I accept' " button, but were instead provided via a hyperlink that, when clicked, took the user to a separate page displaying the full set of terms. (*Id.* at pp. 23–24; *Nguyen, supra,* 763 F.3d at pp. 1175–1176.)

As the internet evolved, so did the various manners in which providers sought to impose contractual terms on consumers. Most courts now have identified at least four types of internet contract formation, most easily defined by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps. (See *Selden*, *supra*, 2016 WL 6476934 at *4.)

"A '*browsewrap*' agreement is one in which an internet user accepts a website's terms of use merely by browsing the site. A '*clickwrap*' agreement is one in which an internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available. A '*scrollwrap*' agreement is like a 'clickwrap,' but the user is presented with the entire agreement and must physically scroll to the bottom of it to find the 'I agree' or 'I accept' button. . . . '*Sign-in-wrap*' agreements are those in which a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up." (*Selden, supra*, 2016 WL 6476934 at *4, italics added; see also *Nguyen, supra,* 763 F.3d at p. 1176; *Berkson v. Gogo LLC* (E.D.N.Y 2015)

19

97 F.Supp.3d 359, 394–395 (*Berkson*).)  Instead, "the website is designed so that a user is notified of the existence and applicability of the site's 'terms of use' [usually by a textual notice] when proceeding through the website's sign-in or login process." (*Berkson*, at p. 399.)

By their nature, internet contracts almost always fall into the category of adhesion contracts.  " 'The term [contract of adhesion] signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113; see also *Specht, supra,* 306 F.3d at p. 31 [comparing internet contracts to paper adhesion contracts]; *Selden, supra,* 2016 WL 6476934 at *4 [characterizing internet contract formation as "[o]nline [a]dhesion [c]ontracting"]; *Berkson, supra,* 97 F.Supp.3d at pp. 388–391, 394–395 [discussing paper-based and "[e]lectronic [a]dhesion [c]ontracts"].)  In an internet transaction, the contractual terms are drafted solely by the provider and placed most often on a separate webpage that is accessible only if the user sees and clicks on a hyperlink.  The consumer usually does not have any direct contact with the provider and, thus, even if the consumer is aware of the terms the provider wishes to impose, the consumer does not have *any* ability to bargain.  Thus, the terms are offered on a purely take-it or leave-it basis.  (See *Neal v. State Farm Ins. Companies* (1961) 188 Cal.App.2d 690, 694 ["Such an agreement does not issue from that freedom in bargaining and equality of bargaining which are the theoretical parents of the American law of contracts."].)

At the same time, internet commerce is now ubiquitous, and it is becoming increasingly difficult for consumers to avoid online transactions altogether.  This has been particularly true during the recent Covid-19

20

pandemic. Many brick-and-mortar businesses closed, at least temporarily, and consumers were subject to stay-at-home orders. As a result, consumers have been forced to rely on online stores to fulfill even their most basic, everyday needs.

With the ubiquity of internet commerce, online providers have sought to impose contractual terms on even the most trivial of transactions. For example, a website provider may seek to impose contractual terms in connection with the sale of a single item, such as a pair of socks, a transaction in which most consumers would not expect to be bound by contractual terms. (See *Long, supra,* 245 Cal.App.4th at p. 866 [suggesting a consumer does not expect to be bound by contractual "Terms of Use" when purchasing flowers].) Further, the terms may appear on a separate page, accessible only if the consumer clicks on a hyperlink, that they likely are not looking for since, of course, they do not expect to be bound by contractual terms when buying socks. That separate *page* may also present significantly more content than a traditional single sheet of paper as the scroll feature allows a single webpage to go on almost indefinitely or, as here, for the equivalent of approximately 26 standard sheets of letter-sized paper. And because the terms appear on a separate, scrollable page—and not, for example, on the package of socks itself—the provider may include far more terms than the consumer would typically expect for such a simple transaction.

Those terms could include, as relevant here, limitations on the consumer's remedies if unsatisfied with their purchase or service, such as agreements to arbitrate, waivers of class action litigation, or consent to the provider's ability to sell data regarding the consumer's shopping profile to other companies. (See *Silver v. Stripe, Inc.* (N.D.Cal., Jul. 28, 2021, No. 4:20-

21

cv-08196-YGR) 2021 WL 3191752 at *1, 4 [online merchant collected and sold customer data based in part on a hyperlinked privacy policy].) Even where the transaction is not as trivial as the purchase of socks or flowers, online providers have complete control over the design of their websites and may present extensive contractual terms in such a manner that the consumer never sees them and, in some cases, may not even know they exist. (See *Berkson, supra,* 97 F.Supp.3d at p. 389 ["Often overlooked in our electronic age is the principle undergirding the validity of contracts of adhesion—knowledge by parties of terms."].)

III.

*Enforceability of Sign-In Wrap Agreements to Arbitrate*

Of the four types of internet contract formation, JustAnswer asserts its website employed a sign-in wrap agreement, and that federal courts applying California law "have held that this type of display of a hyperlinked notice to the terms of service suffices to put a user on inquiry notice of an arbitration agreement." We agree this case involves a sign-in wrap agreement. (See *Selden, supra,* 2016 WL 6476934 at *4.) JustAnswer's website was designed to purportedly notify consumers of the existence of a separate, hyperlinked webpage containing contractual terms, along with a textual notice that they agree to the terms by clicking the "Start my trial" button. (See *ibid.*) While a hyperlink to the separate agreement was provided, the consumer was not required to click the hyperlink or otherwise read the terms to proceed, and was "not required to [affirmatively] indicate that they have read the agreement's terms before signing up." (See *ibid.*)

However, the "[c]lassification of web based contracts alone . . . does not resolve the [issue of legally sufficient] notice inquiry." (*Meyer v. Uber Technologies, Inc.* (2d Cir. 2017) 868 F.3d 66, 76 (*Meyer*).) The enforceability

22

of contractual terms presented to consumers in a sign-in wrap agreement, including arbitration provisions, is a matter of first impression under California law. While federal courts have addressed these issues, only one California appellate court has considered the enforceability of internet-formed agreements, see *Long, supra,* 245 Cal.App.4th 855, and it addressed a browsewrap agreement only. (*Id.* at p. 863.) As we discuss next, the *Long* court and federal courts have reached consistent conclusions when evaluating the enforceability of agreements at either end of the spectrum, generally finding scrollwrap and clickwrap agreements to be enforceable and browsewrap agreements to be unenforceable. To determine where sign-in wrap agreements fall on this spectrum, we first consider *Long* and the federal decisions on sign-in wrap agreements.[5]

A.     *Long v. Provide Commerce, Inc.*

As noted, *Long* is the first and only California appellate case to have considered the enforceability of internet-formed agreements, and it addressed a browsewrap agreement only. The plaintiffs in *Long* brought a class action on behalf of consumers who purchased flower arrangements on the website, ProFlowers.com, claiming violations of the CLRA and UCL. (*Long, supra,* 245 Cal.App.4th at pp. 858–859.) The website provider sought to compel arbitration based on a provision in the company's "Terms of Use," which were

---

[5]     "We, of course, are not bound by the decision of a sister Court of Appeal. [Citation.] But '[w]e respect stare decisis, however, which serves the important goals of stability in the law and predictability of decision.' " (*The MEGA Life & Health Ins. Co. v. Superior Court* (2009) 172 Cal.App.4th 1522, 1529.) Federal court decisions applying California law also are not binding on this court, but may hold persuasive value. (*People v. Brooks* (2017) 3 Cal. 5th 1, 90 (*Brooks*) ["We are not bound by the decisions of the federal appellate courts, although they may be considered for their persuasive weight."].)

23

viewable via a hyperlink displayed at the bottom of each page of the website.[6] (*Ibid.*)

The *Long* court determined the terms of use agreement was a browsewrap agreement. It noted that "[u]nlike the other common form of [i]nternet contract—known as 'clickwrap' agreements—browsewrap agreements do not require users to affirmatively click a button to confirm their assent to the agreement's terms; instead, a user's assent is inferred from his or her use of the [website]. Because assent must be inferred, the determination of whether a binding browsewrap agreement has been formed depends on whether the user had actual or constructive knowledge of the [website's] terms and conditions." (*Long, supra*, 245 Cal.App.4th at p. 858.) However, acknowledging "that no California appellate court has yet addressed what sort of [website] design elements would be necessary or sufficient to deem a browsewrap agreement valid in the absence of actual notice," the court sought guidance from two federal circuit cases—*Specht* and

---

[6] ProFlowers.com's terms of use "were available via a capitalized and underlined hyperlink titled '*TERMS OF USE*' located at the bottom of each Web page. The hyperlink was displayed in what appears to have been a light green typeface on the [website's] lime green background, and was situated among 14 other capitalized and underlined hyperlinks of the same color, font and size." (*Long, supra*, 245 Cal.App.4th at p. 859.) "[T]o complete his order, Plaintiff was required to input information and click through a multi-Web-page 'checkout flow.' The checkout flow screenshots show the customer information fields and click-through buttons displayed in a bright white box set against the [website's] lime green background. At the bottom of the white box was a notice indicating 'Your order is safe and secure,' displayed next to a 'VeriSign Secured' logo. [Boldface omitted.] Below the white box was a dark green bar with a hyperlink titled 'SITE FEEDBACK' displayed in light green typeface. Finally, below the dark green bar, at the bottom of each checkout flow page, were two hyperlinks titled 'PRIVACY POLICY' and 'TERMS OF USE,' displayed in the same light green typeface on the [website's] lime green background." (*Id.* at pp. 859–860.)

*Nguyen*—which, applying California contract law, considered the enforceability of browsewrap agreements. (*Long,* at p. 863.)

As the court in *Long* explained, in *Specht*, the Second Circuit Court of Appeals "declined to enforce an arbitration provision contained in a software licensing browsewrap agreement where the hyperlink to the agreement appeared on 'a submerged screen' below the ' "Download" ' button that the plaintiffs clicked to initiate the [free] software download." (*Long*, *supra*, 245 Cal.App.4th at pp. 863–864, citing *Specht*, *supra*, 306 F.3d at pp. 30–32.) Then Judge Sotomayor, writing for the *Specht* court, held " 'a consumer's clicking on a download button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the download button would signify assent to those terms.' " (*Long,* at p. 864, citing *Specht*, at pp. 29–30.)

"Though the [website] advised users to ' "Please review and agree to the terms of the . . . software license agreement before downloading and using the software," ' the *Specht* court emphasized that users would have encountered this advisement only if they scrolled down to the screen below the [website's] invitation to download the software by clicking the download button. (*Specht*, *supra*, 306 F.3d at p. 23, italics omitted.) This meant that when the plaintiffs clicked the download button, they 'were responding to an offer that did not carry an immediately visible notice of the existence of license terms or require unambiguous manifestation of assent to those terms.' (*Id*. at p. 31.) The fact that users might have noticed from the position of the scroll bar that an unexplored portion of the Web page remained below the download button did not change the reasonableness calculation. Under the circumstances presented, 'where consumers [were] urged to download free software at the immediate click of a button,' the *Specht* court concluded placing the notice of

25

licensing terms on a submerged page ' "tended to conceal the fact that [downloading the software] was an express acceptance of [the defendant's] rules and regulations." ' (*Id.* at p. 32.) Thus, notwithstanding what the plaintiffs might have found had they taken ' "as much time as they need[ed]" to scroll through multiple screens on a webpage' (*ibid.*), the *Specht* court held that 'a reasonably prudent offeree in plaintiffs' position would not have known or learned . . . of the reference to [the software's] license terms hidden below the "Download" button on the next screen.' (*Id.* at p. 35.)" (*Long*, *supra*, 245 Cal.App.4th at p. 864.)

The *Long* court then looked to *Nguyen*, in which the Ninth Circuit Court of Appeals, more than a decade after *Specht*, "considered whether the *conspicuous* placement of a " 'Terms of Use' hyperlink, *standing alone*, would be sufficient to put an [i]nternet consumer on inquiry notice." (*Long*, *supra*, 245 Cal.App.4th at p. 864, citing *Nguyen*, *supra*, 763 F.3d at p. 1178, italics added.) Although "the hyperlink in *Nguyen* was visible 'without scrolling' on some of the [website's] pages, while on others 'the hyperlink [was] close enough to the "Proceed with Checkout" button that a user would have to bring the link within his field of vision' to complete an online order," the *Nguyen* court "concluded the plaintiff's act of placing an order did not constitute an unambiguous manifestation of assent to be bound by the browsewrap agreement, holding 'proximity or conspicuousness of the hyperlink alone is not enough to give rise to constructive notice.' " (*Long*, at pp. 864–865, citing *Nguyen*, at p. 1178.)

The *Nguyen* court observed that "in cases where [federal district] courts had 'relied on the proximity of the hyperlink *to enforce* a browsewrap agreement,' . . . those [websites] had 'also included something more to capture the user's attention and secure her assent.' . . . Typically that 'something

26

more' had taken the form of an explicit textual notice warning users to ' "Review terms" ' or admonishing users that by clicking a button to complete the transaction ' "you agree to the terms and conditions in the [agreement]." ' . . . From those cases, the *Nguyen* court derived the following bright-line rule for determining the validity of browsewrap agreements: '[W]here a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice.' " (*Long*, *supra*, 245 Cal.App.4th at p. 865, citing *Nguyen*, *supra*, 763 F.3d at pp. 1178–1179 & fn. 1.)

Applying the principles articulated in *Specht* and *Nguyen*, the court in *Long* concluded "the design of the ProFlowers.com [website], even when coupled with the hyperlink contained in the confirmation e-mail,[7] was insufficient to put Plaintiff on inquiry notice of the subject Terms of Use." (*Long*, *supra*, 245 Cal.App.4th at p. 863.) The court rejected the website provider's argument that its hyperlink was sufficiently conspicuous to put " 'a reasonable user' " on notice of the terms of use because it was " 'immediately

---

7    After an order for flowers is placed on the website, the website provider sends the consumer an e-mail confirming the order, which included two hyperlinks titled " '*PRIVACY POLICY* ' " and " '*TERMS OF USE*.' " (*Long*, *supra*, 245 Cal.App.4th at p. 866.) The court explained, "[u]nlike the hyperlink on some checkout flow pages," these hyperlinks were located on a "submerged page . . . printed in grey typeface on a white background," and concluded "[t]his is not the sort of conspicuous alert that can be expected to put a reasonably prudent [i]nternet consumer on notice to investigate whether disputes related to his or her order will be subject to binding arbitration." (*Id.* at pp. 866–867.)

visible on the checkout flow, [was] viewable without scrolling, and located next to several fields that the website user [was] required to fill out and the buttons he must click to complete an order.' " (*Id.* at p. 865.) The court held: "Though it may be that an especially observant [i]nternet consumer could spot the Terms of Use hyperlinks on some checkout flow pages without scrolling, that quality alone cannot be all that is required to establish the existence of an enforceable browsewrap agreement. Rather, as the *Specht* court observed, '[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility.' [Citation.] Here, the Terms of Use hyperlinks—their placement, color, size and other qualities relative to the ProFlowers.com [website's] overall design—are simply too inconspicuous to meet that standard." (*Id.* at pp. 865–866, citing *Specht*, *supra*, 306 F.3d at p. 35.)

Although "the lack of conspicuousness resolve[d] the instant matter," the *Long* court went on to express its agreement with *Nguyen* that, "to establish the enforceability of a browsewrap agreement, a textual notice should be required to advise consumers that continued use of a [website] will constitute the consumer's agreement to be bound by the [website's] terms of use." (*Long*, *supra*, 245 Cal.App.4th at p. 867, citing *Nguyen*, *supra*, 763 F.3d at pp. 1178–1179.) "In [the court's] view, the problem with merely displaying a hyperlink in a prominent or conspicuous place is that, without notifying consumers that the linked page contains binding contractual terms, the phrase 'terms of use' may have no meaning or a different meaning to a large segment of the [i]nternet-using public." (*Long*, at p. 867.) "In other words, a conspicuous 'terms of use' hyperlink may not be enough to alert a reasonably prudent [i]nternet consumer to click the hyperlink. As the *Nguyen* court

28

observed, '[w]hile failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract, [citation], the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the *breadth of the range of technological savvy of online purchasers,* consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound.' " (*Ibid.*, citing *Nguyen*, at p. 1179.) The *Long* court, *in dicta*, suggested that "[o]nline retailers would be well-advised to include a conspicuous textual notice with their terms of use hyperlinks going forward." (*Long*, at p. 867.)

B.      *Internet Contract Formation Following* Long

Although *Long* directly addressed only a browsewrap agreement, it, along with the federal cases it relied upon, provides general guidance that allows us to set some basic guideposts as to the enforceability of the various types of agreements formed over the internet.

On one end of the spectrum, a browsewrap agreement like the one at issue in *Long*—in which the website provider assumes assent is given by mere use of the website, based exclusively on the existence of a hyperlink that takes the consumer to the applicable set of contractual terms—is not sufficient to bind the consumer. (*Long, supra,* 245 Cal.App.4th at pp. 865, 867; see also *Berkson, supra*, 97 F.Supp.3d at p. 396 ["Following the ruling in *Specht*, [federal district] courts generally have enforced browsewrap terms only against knowledgeable accessors, such as corporations, not against individuals."].) Toward the other end of the spectrum, clickwrap agreements, " 'in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use' " to "confirm their assent to the agreement's terms," are generally considered enforceable. (*Long*, at

29

pp. 858, 862, citing *Nguyen, supra,* 763 F.3d at pp. 1175–1176; see also *Berkson*, at p. 397 ["Clickwrap agreements necessitate an active role by the user of a website" and thus "[c]ourts, in general, find them enforceable."].) Scrollwrap agreements go one step further and place the contractual terms directly in front of the user, requiring them to scroll through the terms before checking a box or clicking a button to indicate their assent, and, therefore, are consistently found to be enforceable. (See *Berkson,* at pp. 398–399 [citing cases finding "scrollwrap" agreements enforceable].) Although not explicitly addressed in *Long*, there should be little doubt scrollwrap agreements are enforceable under California law because the consumer is given the contract, a sufficient circumstance to place the consumer on inquiry notice of the contractual terms. (See *Barrett Garages, supra,* 257 Cal.App.2d at p. 76; *Specht, supra,* 306 F.3d at p. 31.)

Sign-in wrap agreements fall somewhere in the middle of the two extremes of browsewrap and scrollwrap agreements. Sign-in wrap agreements do include a textual notice indicating the user will be bound by the terms, but they do not require the consumer to review those terms or to expressly manifest their assent to those terms by checking a box or clicking an "I agree" button. Instead, the consumer is purportedly bound by clicking *some other* button that they would otherwise need to click to continue with their transaction or their use of the website—most frequently, a button that allows the consumer to "sign in" or "sign up" for an account. Thus, it is not apparent that the consumer is aware that they are agreeing to contractual terms simply by clicking some other button. Instead, "the consumer's assent is 'largely passive,' " and the existence of a contract turns " 'on whether a reasonably prudent offeree would be on inquiry notice of the terms at issue.' " (*Selden, supra,* 2016 WL 6476934 at *4.)

C.      *Federal District Court Decisions on Sign-In Wrap Agreements*

Since *Long*, a number of federal courts have found the textual notices associated with various sign-in wrap agreements sufficient to bind consumers to contractual terms appearing in hyperlinked terms of use.  (See, e.g., *Dohrmann v. Intuit, Inc.* (9th Cir. 2020) 823 Fed.Appx. 482, 484 (*Dohrmann*); *Meyer*, *supra*, 868 F.3d at pp. 77–78; *Selden, supra*, 2016 WL 6476934 at *5; *Metter v. Uber Technologies, Inc.* (N.D.Cal., Apr. 17, 2017, No. 16-cv-06652-RS) 2017 WL 1374579 (*Metter*).)  JustAnswer urges us to recognize sign-in wrap agreements as a "new species" of online contract formation under California law, to set "clear rules" for evaluating their enforceability in "uniformity with the federal precedents," and to hold that its website satisfies the criteria set forth in the federal cases.

We recognize sign-in wrap agreements as a potential form of internet contract formation, and acknowledge that " '[c]ourts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract,' and that '[t]here is nothing automatically offensive about such agreements, *as long as* the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement.' " (*Meyer*, *supra*, 868 F.3d at p. 75, italics added.)  But, in our view, the federal courts have trended towards finding nearly *any* textual notice sufficient to bind a consumer, while also applying largely subjective criteria that, at times, results in inconsistent conclusions.  This is perhaps in part because the transactions at issue in the federal cases addressing sign-in wrap agreements mostly involve a consumer signing up for an ongoing account and, thus, it is reasonable to expect that the typical consumer in that type of transaction contemplates entering into a continuing, forward-looking relationship.  However, given the context of the specific transaction at issue in this case, in

31

which the Legislature has acknowledged that consumers often do *not* expect to enter into an ongoing relationship (see Sen. Jud. Com., Analysis of Sen. Bill. No. 340 (2009–2010 Reg. Sess.) as amended Apr. 2, 2009, p. 4), we are not persuaded that the federal cases JustAnswer relies upon are sufficiently analogous.

As we have noted, no California appellate court has directly addressed the validity of sign-in wrap agreements.  The court in *Long* suggested "[o]nline retailers would be *well-advised* to include a conspicuous textual notice with their terms of use hyperlinks going forward." (*Long, supra,* 245 Cal.App.4th at p. 867, italics added.)  However, the court made that statement in the context of addressing a browsewrap agreement that did not include *any* textual notice and the advisement was not essential to the court's holding.  (*Ibid*.)  As JustAnswer acknowledges, the court's statement was dicta.  (See *Fireman's Fund Ins. Co. v. Maryland Cas. Co.* (1998) 65 Cal.App.4th 1279, 1301.)  Moreover, we do not read *Long* to suggest that *any* textual notice accompanying a hyperlink is sufficient to bind a consumer, and the court in *Long* did not provide any guidance regarding what would make a given textual notice sufficiently conspicuous to bind the consumer.  (*Long, supra,* at p. 867.)

In surveying the federal court decisions, it appears the overall trend has been to find sign-in wrap agreements enforceable based on the existence of essentially any textual notice that purports to inform consumers they agree to the terms by signing up for an account or otherwise continuing to use the website.  (See, e.g., *Britt v. ContextLogic, Inc.* (N.D.Cal., Apr. 9, 2021, No. 3:20-cv-04333-WHA) 2021 WL 1338553 at *3–5; *Dohrmann, supra,* 823 Fed.Appx. at p. 484; *Allen v. Shutterfly, Inc.* (N.D.Cal., Sept. 14, 2020, No. 20-cv-02448-BLF) 2020 WL 5517172 at *6; *Feld v. Postmates, Inc.* (S.D.N.Y.

32

Mar. 3, 2020) 442 F.Supp.3d 825, 831–832 (*Feld*).)  Indeed, there are relatively few cases finding a sign-in wrap agreement insufficient to bind the consumer.  (See, e.g., *Colgate v. JUUL Labs, Inc.* (N.D.Cal. 2019) 402 F.Supp.3d 728, 764–766 (*JUUL*); *Cullinane v. Uber Technologies, Inc.* (1st Cir. 2018) 893 F.3d 53, 63 (*Cullinane*); *Berkson, supra,* 97 F.Supp.3d at pp. 403–404.)  While some may characterize these latter cases as outliers, in our view, they reveal some important limitations of the current state of the law in these federal cases.

We first note the inconsistencies inherent in the subjective criteria federal courts have relied upon to find sign-in wrap agreements enforceable. While *Long* did not provide any specific guidance regarding the design elements necessary to make a textual notice sufficiently conspicuous to bind a consumer, it did rely on the "placement, color, size and other qualities [of the terms of service hyperlinks] relative to the . . . [website's] overall design" to conclude the hyperlinks standing alone were not sufficiently conspicuous to establish inquiry notice.  (*Long*, *supra,* 245 Cal.App.4th at p. 866; see also *Nguyen, supra,* 763 F.3d at pp. 1177–1178 [discussing placement, color, and contrast of hyperlinks and the website's general design].)  Federal courts relying on *Long* and *Nguyen* have generally considered similar criteria when determining whether a textual notice is sufficiently conspicuous under California law.  These criteria include:  1) the size of the text; 2)  the color of the text as compared to the background it appears against; 3) the location of the text and, specifically, its proximity to any box or button the user must click to continue use of the website; 4) the obviousness of any associated hyperlink; and 5) whether other elements on the screen clutter or otherwise obscure the textual notice.  (See, e.g., *Dohrmann, supra,* 823 Fed.Appx. at p. 484 [considering the website's general design and the font and location of

the advisement]; *Meyer, supra,* 868 F.3d at p. 78 [considering font, contrast, and location of the advisement, and the style of the hyperlinks]; *Selden, supra,* 2016 WL 6476934 at *5 [considering font size and contrast with the background, and the proximity of the advisement].)

Because the threshold issue of the existence of a contract is for the courts to decide, the issue of conspicuousness is typically characterized as a question of law. (See *Long, supra,* 245 Cal.App.4th at p. 863; *Bono, supra,* 147 Cal.App.4th at pp. 1061–1062.) What the courts are actually conducting when considering these criteria, however, is a fact-intensive inquiry. (*Meyer, supra,* 868 F.3d at p. 76 ["Insofar as it turns on the reasonableness of notice, the enforceability of a web-based agreement is clearly a fact-intensive inquiry."].) Moreover, the criteria are largely subjective, and there naturally may be different views regarding, for example, what size or color of text makes a given textual notice sufficiently conspicuous to bind a user. Thus, the inquiry invariably lends itself to a more subjective than objective analysis and, as a result, some courts have reached seemingly inconsistent results.

For example, in *Metter*, the court considered whether a textual notice next to the " 'REGISTER' " button on the Uber sign-up page that read, " 'BY CREATING AN UBER ACCOUNT, YOU AGREE TO THE **TERMS OF SERVICE & PRIVACY POLICY**,' " was sufficient to bind consumers to an arbitration provision contained in the hyperlinked terms of service. (*Metter, supra,* 2017 WL 1374579 at *3.) Relying on *Nguyen*, the court acknowledged, "[i]n the context of an electronic consumer transaction, the occurrence of mutual assent ordinarily, as here, turns on whether the consumer had reasonable notice of a merchant's terms of service agreement," and concluded "the alert's font, size, color, and placement relative to the 'REGISTER' button render it sufficiently conspicuous to alert an Uber registrant that he is

34

agreeing to Uber's terms of service." (*Id.* at *2–3.) A number of other federal courts evaluating similar Uber sign-up webpages have likewise concluded that consumers "affirmatively assent to Uber's terms and conditions by clicking 'DONE' " or " 'REGISTER' " on a sign-up page containing a similar textual notice. (*Cordas v. Uber Technologies, Inc.* (N.D.Cal 2017) 228 F.Supp.3d 985, 990 (*Cordas*); *West v. Uber Technologies* (C.D.Cal., Sep. 5, 2018, No. 18-CV-3001-PSG-GJS) 2018 WL 5848903 at *3–6); see also *Meyer, supra,* 868 F.3d at p. 78.)

However, looking at essentially the same Uber sign-up webpages, another court found the textual notice was not sufficiently conspicuous in the context of the overall "design and content" of the relevant screens. (*Cullinane, supra,* 893 F.3d at p. 63.) Although JustAnswer argues *Cullinane* is distinguishable because it was decided under Massachusetts law, the court there similarly considered whether the notice was " '[r]easonably conspicuous.' " (*Id.* at p. 61.) Moreover, in *JUUL*, the court relied, in part, on *Cullinane* to conclude textual notices similar in style, format, and placement also were not sufficiently conspicuous. (*JUUL, supra,* 402 F.Supp.3d at pp. 764–766.) Thus, as the Second Circuit Court of Appeals has acknowledged, "reasonable minds could disagree on the reasonableness of notice." (*Nicosia v. Amazon.com, Inc.* (2d Cir. 2016) 834 F.3d 220, 238; *Meyer, supra,* 868 F.3d at p. 76 [citing *Nicosia* and acknowledging "reasonable minds could disagree regarding the sufficiency of notice" provided to online consumers].)

JustAnswer urges this court to set "clear rules" for the evaluation of sign-in wrap agreements, but, to do so in "uniformity with the federal precedents." While we agree a bright-line rule, or set of rules, preferably developed by the Legislature, would provide greater certainty to both

35

providers and consumers, these federal precedents do not provide such certainty. *Metter* and *Cullinane* is one example of two different courts applying the same substantive law to essentially the same facts, but reaching opposite conclusions. JustAnswer fails to acknowledge the inconsistencies inherent in the subjective criteria those courts have relied upon to find other sign-in wrap agreements enforceable.

Second, we note the individual courts have relied on similarly, subjective views about the experience, knowledge, and skill level of the "typical" online consumer. Relying on *Nguyen*, the court in *Long* explained, " 'the validity of [a] browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract.' " (*Long, supra,* 245 Cal.App.4th at pp. 858, 863.) Although the court in *Long* did not explicitly define the term " 'reasonably prudent user,' " it used it in a limiting sense, focusing primarily on what " 'a reasonably prudent offeree in plaintiffs' position would *not* have known or learned.' " (*Id.* at pp. 864, 866–867, italics added.) Indeed, the court impliedly rejected the standard of "an especially observant [i]nternet consumer." (*Id.* at pp. 865–866.)

Contrary to the analysis in *Long*, federal courts have taken significantly different views about the typical online consumer. In *Selden*, the court believed "[t]he act of contracting for consumer services online is now commonplace in the American economy," such that "[a]ny reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider." (*Selden, supra*, 2016 WL 6476934 at *5.) Thus, "while the record [was] silent as to [the plaintiff's] particular history with e-commerce, [the *Selden* court found] the prevalence of online contracting in contemporary

36

society lends general support to the [c]ourt's conclusion that [plaintiff] was on notice that he was entering a contract with" the provider. (*Ibid.*) Similarly, other courts have refused to "presume that the user has never before encountered an app or entered into a contract using a smartphone." (*Meyer, supra,* 868 F.3d. at p. 77; see also *Feld, supra,* 442 F.Supp.3d at p. 830 [quoting *Meyer*]; but see *Dohrmann, supra,* 823 Fed.Appx. at pp. 484–485 [majority and dissenting judge disagree over whether "reasonably prudent user would have inquiry notice of the terms of use"].)

However, not all internet users are alike. Given the proliferation of internet-based commerce in recent years, more and more consumers are using the internet each day. Although " '[m]odern cell phones . . . are now such a pervasive and insistent part of daily life' " for many (*Meyer, supra,* 868 F.3d at p. 77), others have only recently, and perhaps begrudgingly, begun to use cell phones, or other internet-enabled devices, for the purpose of online commerce. Importantly, the website service at issue here is marketed towards users as young as 13 years old. Even if children knew how to use a smartphone and are familiar with the internet, they are not likely to understand that their use of a website may be governed by contractual terms, or that those terms may be included in a hyperlinked "terms of use."

Despite conducting extensive research on the topic, the court in *Berkson* concluded there is very little empirical evidence regarding "what the average internet user perceives to be the meaning of the phrase 'terms of use' or 'terms and conditions,' or the degree to which he or she is aware that each time a purchase is conducted over the internet, a binding contract regarding more than just the promise to pay may be being entered into." (*Berkson, supra,* 97 F.Supp.3d at p. 380; accord *Long, supra,* 245 Cal.App.4th at p. 867 ["the phrase 'terms of use' may have no meaning or a different meaning to a

37

large segment of the [i]nternet-using public"].)  Thus, the *Berkson* court observed that "[c]ourts have 'decided,' based largely on speculation, what constitutes inquiry notice of a website's 'terms of use.' " (*Berkson,* at p. 380.)

In our view, it is more appropriate to focus on the providers, which have complete control over the design of their websites and can choose from myriad ways of presenting contractual terms to consumers online.  These include clickwrap and scrollwrap agreements that eliminate any uncertainty as to the consumer's notice of contractual terms and assent to those very terms.  We therefore agree with the courts in *Long* and *Nguyen* that " 'the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers.  Given the *breadth of the range of technological savvy of online purchasers,* consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound.' " (*Long, supra,* 245 Cal.App.4th at p. 867, citing *Nguyen, supra,* 763 F.3d at p. 1179; see also *Berkson*, *supra*, 97 F.Supp.3d at p. 382 ["The offeror has thought through the problems with the aid of lawyers and other experts and is a 'repeat player.' "])

This is particularly true when the transaction is one in which the typical consumer would not expect to enter into an ongoing contractual relationship, regardless of whether the transaction occurs online or in person.  As we have noted, it is questionable whether a consumer buying a single pair of socks, or signing up for a free trial, would expect to be bound by contractual terms, and a consumer that does not expect to be bound by contractual terms is less likely to be looking for them.

In *Specht*, the court concluded, "where consumers are urged to download free software at the immediate click of a button, a reference to the existence of license terms on a submerged screen is not sufficient to place

consumers on inquiry or constructive notice of those terms." (*Specht, supra,* 306 F.3d at p. 32.) As the court explained, "[w]hen products are 'free' and users are invited to download them in the absence of reasonably conspicuous notice that they are about to bind themselves to contract terms, the transactional circumstances cannot be fully analogized to those in the paper world of arm's length bargaining." (*Ibid.*)

Similarly, the court in *Long* emphasized the expectations of a consumer in the context of the transaction at issue, the purchase of a single flower arrangement. After noting the hyperlinks to the terms of service at the bottom of the page were difficult to find "*even when one is looking for them,*" the court went on to explain, "[t]his of course is to say nothing of how observant an [i]nternet consumer must be to discover the hyperlinks in the usual circumstance of using ProFlowers.com *to purchase flowers,* without any forewarning that he or she should also be on the lookout for a reference to 'Terms of Use' somewhere on the [website's] various pages." (*Long, supra,* 245 Cal.App.4th at p. 866.)

By contrast, the majority of the federal cases finding an enforceable sign-in wrap agreement involve continuing, forward-looking relationships. For example, in *Meyer,* the court concluded that the "transactional context of the parties' dealings reinforce[d] [its] conclusion" of sufficient inquiry notice. (*Meyer*, *supra*, 868 F.3d at p. 80.) There, the plaintiff "located and downloaded the Uber app, signed up for an account, and entered his credit card information with the intention of entering into a *forward-looking relationship* with Uber. The registration process clearly contemplated some sort of *continuing relationship* between the putative user and Uber, one that would require some terms and conditions, and the Payment Screen provided

39

clear notice that there were terms that governed that relationship." (*Ibid.*, italics added.)

Here, Plaintiffs were offered a $5 "trial" and alleged—like the consumer downloading free software or purchasing flowers—that they did not anticipate that they would enter into an ongoing relationship governed by extensive contractual terms simply because they submitted a single question for a "trial" and a one-time fee of $5. Indeed, as we discuss next, in this specific type of transaction, the Legislature has acknowledged that consumers are often enrolled in automatic renewal membership programs without their knowledge or consent, and has therefore set forth specifically defined statutory notice requirements pertaining to the enrollment of consumers in such programs. (See § 17601, subd. (c).)

IV.

*The Textual Notices on the JustAnswer "Start my trial" Screens Were Not*

*Sufficiently Conspicuous to Bind Plaintiffs to the Arbitration Provision*

A.    *A Textual Notice of the Existence of Contractual Terms That Limit the Consumer's Ability to Address Alleged ARL Violations Must Be Considered in the Context of the ARL*

As we have just explained, the full context of the transaction is critical to determining whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms. (See *Long, supra,* 245 Cal.App.4th at p. 866; *Specht, supra,* 306 F.3d at p. 32; *Meyer, supra*, 868 F.3d at p. 80.) Here, the underlying transaction involved a $5 "trial" that automatically enrolled consumers in a relatively costly recurring monthly membership. Since the Legislature has specifically addressed the notice requirements for this type of transaction under the ARL, we consider those

40

requirements when evaluating the transaction as a whole.[8]  Doing so, we conclude the notices on the "Start my trial" screens of the JustAnswer website were not sufficiently conspicuous to bind Plaintiffs, both because they were less conspicuous than the ARL's statutory notice requirements[9] and because they were not sufficiently conspicuous even when considering the more subjective criteria applied in the more recent federal cases.

When a user first accesses the JustAnswer website, regardless of the type of device they use, they are offered the chance to "[t]alk to doctors, lawyers, vets, [and] more in minutes" and are presented with a box where

[8]     During oral argument, counsel for JustAnswer agreed it was critical for courts to consider the transactional context in determining whether there is sufficient inquiry notice.  Yet, he then asserted there was "no significance" to the ARL or its statutory definition of "clear and conspicuous" notice for the very transaction at issue here.  Counsel argued the ARL provides specific remedies for violations, those remedies do not include the right to void a contract, and, as evidenced by other statutes, the Legislature could have included a right to cancel or void the contract if it had so intended.  We are not persuaded.  Counsel focused primarily on section 17603, which addresses when a business sends merchandise under an automatic renewal agreement without the consumer's consent.  Although that circumstance is not present here, the remedy in section 17603 is for the item to be deemed an "unconditional gift" to the consumer, "without any obligation whatsoever on the consumer's part," which, effectively, voids at least any contractual term requiring the consumer to pay for the item.  Further, the ARL addresses continuous service agreements, and section 17604 provides that "all available civil remedies that apply to a violation of this article may be employed."

[9]     We express no opinion as to whether the notice of JustAnswer's automatic renewal membership program met the ARL requirements or the viability of Plaintiffs' second cause of action (see *Mayron v. Google LLC* (2020) 54 Cal.App.5th 566, 572 (*Mayron*) [concluding the ARL may be enforced through the UCL but does not establish an independent private right of action], and instead conclude only that JustAnswer may not preclude Plaintiffs from litigating that claim based on a significantly less conspicuous notice of an agreement to arbitrate.

41

they can type a question.  Notably, there is no mention of cost on this initial screen.  However, once the user submits their question, instead of receiving a response, they are directed to a payment page and offered the opportunity to "get [their] answer in minutes" by signing up for a $5 "trial."  Instead of a $5 trial, though, they are enrolled in a costly monthly membership.

As the Legislature explained in enacting the ARL, it has become increasingly common for consumers to complain about being charged for services they did not request—or to find out they allegedly entered into an ongoing contract for services they did not realize they were agreeing to—after making what they believed to be a one-time purchase.  (See Sen. Jud. Com., Analysis of Sen. Bill. No. 340 (2009–2010 Reg. Sess.) as amended Apr. 2, 2009, p. 4.)  Similarly, here, as alleged in the underlying complaint, Plaintiffs believed they would be charged a one-time fee of $5 and would not be charged at all if they were not satisfied with the answers they received.  Plaintiffs raised complaints about the quality of the response they received, and both believed their business dealings with JustAnswer were complete, but both were charged a monthly membership fee for several months.

This is precisely the type of transaction the Legislature intended to regulate in the ARL.  (§ 17600 ["It is the intent of the Legislature to end the practice of ongoing charging of consumer credit or debit cards . . . without the consumers' explicit consent for . . . ongoing deliveries of service."]; Sen. Jud. Com., Analysis of Sen. Bill. No. 340 (2009–2010 Reg. Sess.) as amended Apr. 2, 2009, p. 4.)  To ensure consumers are not enrolled in such programs without their explicit consent, the ARL mandates that businesses present the terms of enrollment in a "clear and conspicuous manner . . . in visual proximity . . . to the request for consent to the offer."  (§ 17602.)  Further, the Legislature defined " 'clear and conspicuous' " to mean "in *larger type* than

42

the surrounding text, or in contrasting type, font, or color to the surrounding text *of the same size*, or set off from the surrounding text *of the same size* by symbols or other marks, in a manner that clearly calls attention to the language." (§ 17601, subd. (c), italics added.) Violations of the ARL are addressed through civil remedies. (§ 17604.)

Here, JustAnswer attempts to thwart Plaintiffs' ability to address the alleged ARL violations by seeking to enforce an arbitration provision and class action waiver included in JustAnswer's terms of service. However, the textual notices of the existence of those terms are significantly less conspicuous than the statutory notice requirements governing Plaintiffs' underlying claims. The text on the "Start my trial" page for desktop users is not "in larger type than the surrounding text" and is not "in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." (§ 17601, subd. (c).) Further, the text appears below the white payment box, outside the user's primary area of focus, and not in "visual proximity . . . to the request for consent." (§ 17602.) Similarly, the textual notice on the mobile version is at the very bottom of the screen, in smaller text than anything else on the page, and in a grey hue that contrasts less with the dark background than any other text on the page. (See § 17601, subd. (c).)

Enforcing a mandatory arbitration provision that includes a class action waiver based on these textual notices—which are less conspicuous than the statutory notice requirements governing Plaintiffs' underlying claims—would permit JustAnswer to end-run around legislation designed to protect consumers in these specific transactions. Although Plaintiffs could at least theoretically address their ARL claim through individual arbitration,

43

those claims are not likely worth pursuing on an individual basis as the value of each individual claim is small. As the California Supreme Court has explained, " '[a] company which wrongfully exacts a dollar from each of millions of customers will reap a handsome profit; the class action is often the only effective way to halt and redress such exploitation.' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 446; see also *Mayron, supra,* 54 Cal.App.5th at p. 572 [concluding the ARL may be enforced through the UCL with the available civil remedies limited to restitution and injunctive relief].) Certainly, JustAnswer was aware of this when they included the arbitration provision and the class action waiver in its terms of service.

Because " 'the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers' " (*Long, supra,* 245 Cal.App.4th at p. 867), a textual notice of the existence of contractual terms that limit the consumer's ability to address ARL violations should, in our view, be at least as conspicuous as the notice required by the statute in the first instance. At a minimum, though, and in the absence of a bright-line rule, the statutory requirements of the ARL, and its stated intent to protect consumers from unwittingly being entered into automatically recurring memberships, must be considered as part of the overall transactional context. The textual notices of the JustAnswer terms of service at issue here not only circumvent the statutory requirements of the ARL, but also fail to provide sufficient notice when considering the overall context of the transaction and the more subjective criteria applied in the federal cases JustAnswer relies upon.

B.  *JustAnswer's Textual Notices Were Not Sufficiently Conspicuous to Provide Plaintiffs with Inquiry Notice*

Again, we begin by considering the context of the transaction. As discussed, a consumer on the JustAnswer website is not asked to "sign up" for

an account but is instead invited to "Start my trial" and get the answer to a single question for a one-time fee of $5. This is not a situation in which "[t]he registration process clearly contemplated some sort of continuing relationship . . . that would require some terms and conditions," nor is there any evidence the Plaintiffs were familiar with the service being offered. (See *Meyer, supra,* 868 F.3d at p. 80.) To the contrary, Plaintiffs were attempting to "[s]tart [a] trial" to determine whether they wanted to use the service at all and were not likely expecting that their "trial" would be governed by approximately 26 pages of contractual terms. Thus, just as they would not likely be looking for small print regarding enrollment in an automatically recurring membership, they also would not likely be scrutinizing the page for small text outside the payment box or at the bottom of the screen linking them to 26 pages of contractual terms. (See *Long, supra,* 245 Cal.App.4th at pp. 866–867.)

Absent such scrutiny, it is not likely a typical consumer would notice the relatively inconspicuous notice of contractual terms that would govern their use of the JustAnswer website. On the desktop version, the notice appears in extremely small print,[10] outside the white box containing the payment fields where the consumer's attention would necessarily be focused. Although the text of the notice appears in white against a dark background, the font is so small that the contrast is not sufficient to make the text apparent. Further, the hyperlink to the terms of service is underlined, but it

---

[10] JustAnswer asks us to consider the size of the text as it would appear on a 20-inch desktop monitor. We decline to do so. Users view webpages on all sizes of screens and, even on a larger screen, may view the website in a smaller window or may increase or decrease the zoom. Rather than consider the size of the text on a particular sized screen, we consider the size of the textual notice in relation to the other text on the screen.

is not set apart in any other way that may draw the attention of the consumer, such as with blue text or capital letters.

The textual notice on the mobile version of the "Start my trial" screen fares no better. It also appears in smaller print than any other print on the page and in a grey shade that contrasts with the dark background significantly less than the other text on the page. And, again, the hyperlink to the terms of service is underlined, but does not otherwise draw the user's attention in any way. Considering all of these factors together, we agree with the trial court that neither of these notices were sufficiently conspicuous to put Plaintiffs on inquiry notice that they would be bound by the terms of service by proceeding with their trial.

JustAnswer asserts its notices are similar to others found sufficiently conspicuous by federal courts. We are not bound by those decisions (see *Brooks, supra,* 3 Cal.5th at p. 90), and, as we have explained, the relevant criteria they applied to evaluate conspicuousness is largely subjective. Moreover, none of the federal cases address a transaction that implicates the ARL, or any other similar statute containing a statutory definition of conspicuous notice that is directly relevant to the context of the transaction. As the courts in *Long* and *Specht* acknowledged, the transactional context is an important factor to consider and is key to determining the expectations of a typical consumer. (See *Long, supra,* 245 Cal.App.4th at p. 866; *Specht, supra,* 306 F.3d at p. 32.)

Further, we note that even minor differences in one or more of the criteria may be sufficient to render a textual notice insufficient. Because website providers have full control over the design of their websites, the onus is on them to provide adequate notice of contractual terms, particularly where, as here, the consumer is not likely expecting to be bound by such

46

terms. (*Nguyen, supra,* 763 F.3d at pp. 1178–1179.) With that in mind, courts must establish clear limits on what constitutes sufficient notice. Even text that is just slightly smaller, or slightly further away from the box or button the consumer must click on must, at some point, exceed the limits of what constitutes adequate notice. (See, e.g., *In re Ring LLC Privacy Litigation* (C.D.Cal., June 24, 2021, No CV 19-10899-MWF (RAOx)) 2021 WL 2621197, Appendix [showing progression from clickwrap to sign-in wrap and associated textual notice moving further away from the sign-in or sign-up button].) Here, JustAnswer chose to use a textual notice attached to a hyperlink as opposed to a pure clickwrap or scrollwrap form, and then chose to display that notice in extremely small print and not immediately adjacent to the "Start my trial" button. By doing so, JustAnswer ran the risk of a court concluding, as we do here, that the notice was not sufficiently conspicuous.

JustAnswer also asserts the Plaintiffs here did not actually deny seeing the textual notice, and instead only denied seeing the terms of service. However, as JustAnswer acknowledges, both Plaintiffs averred they "did not know about [the terms of service] document." Those statements at least suggest Plaintiffs did not see the textual notices. Had they seen them, they would have known about the terms of service document, even if they had chosen not to read it. JustAnswer relies on *Cordas,* where the court pointed out the plaintiff offered no testimony of what he *did* see, but there, the plaintiff disputed the website providers' description of the relevant screens. (See *Cordas, supra,* 228 F. Supp. 3d at pp. 989–990.) Here, there is no such dispute.

In sum, we conclude JustAnswer's textual notices were not sufficiently conspicuous to establish inquiry notice or to infer manifestation of assent

47

and, therefore, are not sufficient to bind Plaintiffs to the arbitration provision set forth in its terms of service.

V.

*The Textual Notices on the Mobile "View Response" Screen Was Not Sufficiently Conspicuous to Bind Plaintiffs*

Finally, we consider the textual notice on the mobile "View response" screen. Although somewhat more like a clickwrap agreement that is generally enforceable (see *Nguyen, supra,* 763 F.3d at p. 1177), this particular notice was also not sufficient to bind Plaintiffs for two reasons.

First, the "View response" screen occurs only *after* the user has already signed up for a "trial"—that is, after the user has already been automatically enrolled in a recurring monthly membership. Therefore, it is not "in visual proximity . . . to the request for consent to the offer," and is not at least as conspicuous as the notice required by the ARL governing these transactions. (See § 17602.) Moreover, and even setting the ARL aside, the user does not see this screen until they attempt to retrieve the answer they have already paid for, and this is *not* where " 'a reasonably prudent user' " would expect to enter into a contract. (See *Long, supra,* 245 Cal.App.4th at p. 863.)

Second, the entirety of the underlined text, "<u>Disclaimer and re-agree to the Terms of Service</u>" is a single hyperlink that goes to a set of disclaimers regarding the accuracy of the answer the user is about to receive, and *not* to the terms of service. The consumer finds the terms of service, and the associated arbitration provision, *only* if they click on a separate hyperlink contained in the following text, which appears at the end of each of two sets of disclaimers on the disclaimer page: "You can read more about these policies in our Terms of Service." This language does not suggest the consumer will be bound by those terms and instead, the entire scenario requires the user "to ferret out hyperlinks to terms and conditions to which

48

they have no reason to suspect they will be bound." (*Nguyen, supra,* 763 F.3d at p. 1179; see also *Wilson v. Huuuge, Inc.* (9th Cir. 2019) 944 F.3d 1212, 1221 (*Wilson*).)

JustAnswer contends the Ninth Circuit's decision in *In re Holl* (9th Cir. 2019) 925 F.3d 1076 is instructive, but it is not. There, the court considered a similar scenario in which the consumer had to click a box to agree to the "UPS Technology Agreement" and the "UPS My Choice® Service Terms," both of which were hyperlinked from the accompanying textual notice. (*Id.* at p. 1080.) Neither contained the arbitration provision at issue, and instead, the consumer could find it only by examining one of several documents incorporated by reference in the service terms. (*Id.* at p. 1081.) The court noted, "locating the arbitration clause at issue here requires several steps and a fair amount of web-browsing intuition." (*Id.* at p. 1083.) It went on to point out that the "My Choice Service Terms now include a hyperlink to the UPS Tariff/Terms and Conditions of Service and expressly inform the user that the incorporated document contains an agreement to arbitrate," and indicated it would be "much easier" to determine whether the terms as modified provided sufficient notice of the arbitration provision. (*Id.* at p. 1084.)

However, the matter came to the Ninth Circuit on a petition for writ of mandamus and the court had discretion to deny the writ even if the petitioner demonstrated error. (*In re Holl, supra,* 925 F.3d at pp. 1082–1083.) In that context, the court concluded, "[w]e cannot say, with 'definite and firm conviction,' that the district court erred by finding the incorporation [of the document containing the agreement to arbitrate] valid" and denied the petition. (*Id.* at pp. 1084–1085.)

49

Here, the only evidence in the record establishes the hyperlink does not take the consumer to terms advising them they would be bound by an agreement to arbitrate. Instead, the terms are available only if the consumer scrolls through the disclaimers and clicks on a secondary link to the terms of service. Considering the context of the transaction, the notice was insufficient to bind Plaintiffs.[11] (See *Wilson, supra,* 944 F.3d at p. 1221 ["courts decline to enforce agreements where the terms are available only if users scroll to a different screen [citation], complete a multiple-step process of clicking non-obvious links, [citation], or parse through confusing or distracting content and advertisements"].)

To conclude, we hold that none of the textual notices on the JustAnswer website were sufficiently conspicuous to bind Plaintiffs to the arbitration provision set forth in the terms of service. The trial court properly denied JustAnswer's petition to compel arbitration.

---

[11] In any event, JustAnswer acknowledges the "View response" screen was presented *only* to mobile users. Even if we were to conclude for argument sake that the notice on this page is sufficient to bind users, it would apply only to Sellers and not to O'Grady or other putative class members that viewed the website on a desktop or laptop computer.

## DISPOSITION

The trial court's order denying the petition to compel arbitration is affirmed. Plaintiffs are awarded their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

DO, J.

WE CONCUR:


HALLER, Acting P. J.


O'ROURKE, J.